**Patricia RAMIREZ RIVAS, Petitioner,**

v.

**IMMIGRATION & NATURALIZATION SERVICE, Respondent.**

No. 88–7463.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 14, 1989.

Decided March 29, 1990.

apply to tort claims arising out of activities of    the Postal Service.

Karen Musalo, University of San Francisco Law Clinic, San Francisco, Cal., for petitioner.

Alice Smith, Office of Immigration Litigation, Washington, D.C., for respondent.

Before ALDISERT,* TANG and FLETCHER, Circuit Judges.

FLETCHER, Circuit Judge:

Patricia Ramirez Rivas [1] petitions for review of the decision of the Board of Immigration Appeals (BIA) denying her withholding of deportation and asylum. We grant the petition for review and reverse the BIA's decision on both withholding of deportation and asylum.

* Hon. Ruggero J. Aldisert, United States Circuit Judge for the Third Circuit, sitting by designation.

## FACTS

Petitioner Patricia Ramirez Rivas left El Salvador in February of 1983, when she was fifteen years old. She has a mother and father, seven brothers and sisters, and a half-brother. She has an aunt Elena and an uncle Florencio, who had six children. Their children (Ms. Ramirez's cousins), and Ms. Ramirez's siblings all grew up in Changallo, a village of about one hundred inhabitants. The other relatives whose stories are relevant to this case are two uncles, Erik and Ivan.

Several of Ms. Ramirez's relatives were politically active. All six of her first cousins engaged in guerrilla activities. One of them, Balerio, was killed in combat. Another, Luis, was a combatant, but he did not die in combat. One night in August of 1980, he was dragged from his home and murdered by Salvadoran security forces, known as "death squads." Two of Ms. Ramirez's brothers were guerrillas, and one of them, Salomon, died in combat. Her half-brother, Arnolfo, engaged in propaganda activities such as painting political graffiti for an anti-government organization. He was captured, tortured, and imprisoned. Two uncles, Erik and Ivan, were guerrillas. Erik was captured, tortured, and imprisoned by the government. He was released from prison in 1983 under a general amnesty. Ivan quit fighting with the guerrillas and returned to work in 1985. About two months after he began working, he was "disappeared."

Ms. Ramirez's father, Juan Rivas, was politically neutral. Because of divorce, he lived in a different village, La Libertad. Ms. Ramirez lived with her mother, but out of fear of being harmed in her home village, moved to her father's home in early 1982. During the few months preceding her departure, she alternated living with her father and mother. The father was a farm administrator. He often gave food to the needy, including guerrillas. About three weeks after Ms. Ramirez left El Salvador, armed men burst into her father's

1. Although "Ramirez–Rivas" appears on some of the documents in the record, the petitioner signs her name without a hyphen and she uses the surname "Ramirez."

house and shot him. He survived the attack, but was severely injured.

Pedro Bolanos, a close friend of the family, grew up in a village less than two miles from Changallo. He was a student when the following incident occurred: One night in early 1982, he was beaten and taken to Ms. Ramirez's aunt Elena's house by three armed men who wore civilian clothes. Ms. Ramirez and her mother Olivia were at Elena's house that night. Elena answered the door and saw Bolanos bleeding from his head. The armed men, apparently not knowing who she was, asked her if Elena or Olivia were present; she denied knowing either one of them. Bolanos refused to identify Elena. Three days later, he was found dead and dismembered.

Ms. Ramirez was and is politically neutral. After she had made arrangements to leave the country in late 1982, to say farewell, she began visiting various family members who were being held as political prisoners. She made several visits to the two prisons where relatives were incarcerated. Each time, she was required to show identification and sign her name in a visitors' book. An expert witness, Professor Terry Karl, testified that the visitors' lists were maintained by Salvadoran security forces, the "death squads." She also testified that visiting political prisoners was considered a very political act.

During the period from August, 1980 when Ms. Ramirez's cousin Luis was killed, to February, 1983, when Ms. Ramirez left El Salvador, government agents frequently visited her mother's house and questioned her mother about her brothers. The government agents did not ask for Ms. Ramirez. During that time she was in her early teens, and for most of that time, she was living with her father.

The Immigration and Naturalization Service ("INS" or "Service") began proceedings against Ms. Ramirez in February of 1983. She concedes deportability but asks for asylum and withholding of deportation.

## JURISDICTION

This court has jurisdiction pursuant to the Immigration and Nationality Act, 8 U.S.C. § 1105a.

## STANDARD OF REVIEW

This court reviews the BIA's interpretations of law de novo. *Arteaga v. INS*, 836 F.2d 1227, 1228 (9th Cir.1988). The court reviews the BIA's factual findings under the "substantial evidence" standard. *Diaz–Escobar v. INS*, 782 F.2d 1488, 1492 (9th Cir.1986).

## DISCUSSION

### A.

■ To obtain withholding of deportation, a person must show that it is more likely than not, if returned to her home country, her life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion. Immigration and Nationality Act (INA) § 243(h), 8 U.S.C. § 1253(h); *INS v. Stevic*, 467 U.S. 407, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984). If she makes that showing, withholding of deportation must be granted. To obtain asylum, she must show that she has a well-founded fear of persecution on account of at least one of those same five bases. INA § 208(a), 8 U.S.C. § 1158(a); INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A). A "well-founded" fear is a fear that is both genuine and objectively reasonable. To be objectively reasonable, there must be some reasonable possibility of persecution on one of the five statutorily-impermissible bases, but persecution does not have to be more likely than not. *INS v. Cardoza–Fonseca*, 480 U.S. 421, 431, 107 S.Ct. 1207, 1213, 94 L.Ed.2d 434 (1987). If the applicant makes the requisite showing for asylum, then, unlike in the case of withholding deportation, relief is not mandated but may be granted as a matter of discretion. If the applicant meets the higher standard for withholding of deportation, she is *a fortiori* eligible for asylum. *See Damaize–Job v. INS*, 787 F.2d 1332, 1334 (9th Cir.1986). Because we hold that Ms. Ramirez has proven her entitlement to withholding of deportation under the stricter "clear probability" stan-

dard, we do not analyze the case under the lesser standard.

The petitioner offers two theories according to which she faces a likelihood of persecution on account of "race, religion, nationality, membership in a particular social group, or political opinion." The first theory is that she will likely be persecuted on account of "imputed" political opinion; in other words, the government will accuse her of harboring pro-guerrilla sympathies—even though she does not—and persecute her on that basis. The second is that she will likely be persecuted for being a member of the "particular social group" defined by her extended family. Since we hold that the petitioner has proved her case under the first theory, we do not address the latter theory.

■ In *Hernandez–Ortiz v. INS*, 777 F.2d 509, 516–17 (9th Cir.1985), this court held that persecution "on account ... of political opinion" under § 243(h) includes persecution not only on account of political opinions that the alien actually holds, but also on account of opinions that the persecutor falsely attributes to the alien.[2] The court relied on UNHCR, *Handbook on Criteria and Procedures for Determining Refugee Status* ("UN Handbook") ¶¶ 80–83 (government's persecution of persons to whom it attributes certain political opinions is persecution on account of political opinion). This construction of § 243 makes good sense. It is at least as arbitrary and unjust for a government to persecute persons falsely accused of being ideological enemies as it is for a government to persecute real ideological enemies. Whenever a government persecutes with a political motive, it engages in persecution on account of political opinion. *See Arteaga v. INS*, 836 F.2d 1227, 1232 n. 8 (9th Cir.1988).

An alien makes out a case of likelihood of persecution on the basis of imputed political belief if she can establish that her alleged persecutor is likely to accuse her falsely of holding certain political beliefs or engaging in certain political acts and that

her persecutor is likely to harm her on the basis of that accusation. In this case, it is undisputed that Ms. Ramirez is not now and never has been a participant in or a supporter of the guerrila movement or any other anti-government movement in El Salvador. The questions we address are whether it is likely that Ms. Ramirez will be accused of harboring pro-guerrilla sympathies or engaging in pro-guerrilla acts and whether persons so accused are unfairly punished in El Salvador.

The essence of Ms. Ramirez's claim is that the Salvadoran law enforcement authorities cannot be trusted to find out the truth about her lack of involvement in anti-government activities. She contends that her family's reputation, her visits to prisons where family members were held as political prisoners, and her age will likely subject her to harm at the hands of the government despite the fact that she has never said, let alone done, anything subversive. The INS contends (and the BIA held) that because the victims of most of the incidents Ms. Ramirez recounted did in fact actively oppose the Salvadoran government, those persons were not "persecuted" but rather were punished legitimately. Ms. Ramirez's fears of political persecution, the INS concludes, are thus unreasonable.

The INS misreads our opinion in *Hernandez–Ortiz* and ignores our opinion in *Blanco–Lopez v. INS*, 858 F.2d 531 (1988). In *Hernandez–Ortiz*, 777 F.2d at 516, we held that "when a government exerts its military strength against an individual or a group within its population and there is no reason to believe that the individual or group has engaged in any criminal activity or other conduct that would provide a legitimate basis for government action, the most reasonable presumption is that the government's actions are politically motivated." The INS argues that under *Hernandez–Ortiz*, if the government has *some* reason to believe—no matter how slight—that a person has engaged in criminal activ-

---

2. The definition of "refugee" incorporated in the asylum provision of the Immigration and Nationality Act, § 208, likewise refers to persecution on the basis of political opinion. Accordingly, the concept of imputed political opinion applies to the analysis of asylum as well.

ity, then any action the government takes under that belief—no matter how harsh—is "legitimate" and cannot amount to persecution. *Hernandez–Ortiz* says no such thing. It simply says that when there is *no* evidence of a legitimate, prosecutorial purpose for a government's harassment of a person or group, there arises a presumption that the motive for the harassment is political. In *Blanco–Lopez*, 858 F.2d at 534, we held that when a government harms or punishes someone without undertaking "any formal prosecutorial measures," it engages in *persecution* and not legitimate prosecution. Moreover, the UN Handbook, which the courts have found authoritative in asylum and withholding of deportation case,[3] states in ¶ 85 that punishment, even of those actually guilty of criminal acts, amounts to persecution on the basis of political opinion if the punishment is excessive or arbitrary and is inflicted with a political motive.

In light of these authorities, we examine Ms. Ramirez's claim that she likely will be accused of engaging in anti-government acts and be unfairly punished on that basis. Ms. Ramirez offers three kinds of evidence to support her claim. The first kind of evidence is her own testimony regarding the treatment of the politically active members of her family. It was clear from her testimony, which the Board fully credited, that even the members of her family whom the government might have had legitimate reasons to investigate were punished extrajudicially without even the slightest pretense of due process. Her half-brother Arnolfo, who supported the guerrillas as a propagandist and not as a combatant, was captured, tortured, and imprisoned. Her father was shot, apparently for providing food to the needy, including guerrillas. Whether or not his acts were a proper subject of government investigation, it is clear that the government's method of "investigation" was not designed to discover the truth about his activities and that its punishment without trial was excessive. Ivan Ramirez, the petitioner's uncle, who quit the guerrillas in 1985 and returned to work, was disappeared two months later. Needless to say, there was no trial in his case.

The Service tries to dismiss this evidence, reasoning that because those punished were actual guerrillas or sympathizers and because those not punished, such as the petitioner's mother, were neutral, it follows that the government adequately distinguishes between enemies and neutrals. There are several flaws in this argument. First, its premise is faulty. Ms. Ramirez testified that her father was not a guerrilla sympathizer, and the testimony was fully credited. Giving food to the guerrillas may or may not be a criminal act in El Salvador; there is no evidence in the record that it is a crime and in any event, the BIA did not reach its conclusions on that assumption. Thus it is proper to presume that the government's motive for shooting the father was political. *See Hernandez–Ortiz*, 777 F.2d at 516.

Second, and more fundamentally, the Service's logic is faulty. Ms. Ramirez offered the evidence to show that even when the government is targeting guerrillas, it does so without any due process, excessively punishing the guilty and sweeping in the innocent as well. Under the Service's view, the proof is in the result and not in the process. We have evidence that the results were flawed; in any event, evidence of *how* the security forces proceed is more probative on the issue of their ability to distinguish neutrals from enemies than is evidence that they spared a few persons such as Ms. Ramirez's mother. Moreover, Ms. Ramirez did not rely exclusively on evidence of the government's targeting family members who had aided the guerrillas. She presented other evidence.

The second category of evidence Ms. Ramirez presented was her testimony concerning family members and friends who were not even arguably engaged in political activity and yet were still mistreated by government forces. The most significant testimony of this kind concerned the Pedro

---

**3.** In *Damaize–Job,* 787 F.2d at 1336 n. 5, we noted that the commentary in the UN Handbook was "particularly significant" in analyzing asylum and withholding of deportation cases.

Bolanos incident: Government agents in civilian clothes appeared one night at the house of the petitioner's aunt Elena. The petitioner and her mother, Olivia Ramirez, were at the house at the time of the incident. The agents had Pedro Bolanos with them, a Ramirez family friend who was not politically active. Bolanos was bleeding from his head as the agents asked Elena (not knowing who she was) for Elena or for Olivia Ramirez. Elena denied knowing them. Pedro Bolanos remained silent and did not identify Elena. Bolanos was killed, dismembered, and had his eyeballs plucked out. The Bolanos incident undercuts the Service's assertion that even if Salvadoran security forces act summarily and harshly against enemies, they at least can be trusted to separate enemies from neutrals, and the incident reveals the price a politically inactive Salvadoran may pay simply for association with a family of opposition activists.

The Service responds to the Bolanos incident first by arguing, "There is *no evidence* . . . to show that [he] was persecuted because [he was] a friend of [Ms. Ramirez's] relatives who had been persecuted." Resp. Br. at 17 n. 7 (emphasis added). Pedro Bolanos grew up in a village adjacent to Changallo, where Ms. Ramirez and her politically active cousins (Aunt Elena's children) were raised. He was a close friend of both families. He was beaten and brought to Elena's house, and he refused to identify her to the authorities. Three days later he was found dead. Evidence of the motive of a persecutor is hard to come by. *See Bolanos–Hernandez v. INS*, 767 F.2d 1277, 1285 (9th Cir.1984) ("persecutors are hardly likely to provide their victims with affidavits"). But the closeness in time between Bolanos' refusal to inform on the mother of several guerrillas and his subsequent death and dismemberment provides about as strong an example of circumstantial evidence that the BIA could expect Ms. Ramirez to produce on the issue of whether Bolanos' association with her family's politics was a motive for the killing. Circumstantial evidence, of course, is evidence, not "no evidence," as the Service asserts.

The third kind of evidence Ms. Ramirez presented was information regarding the Salvadoran government's general treatment of persons associated with guerrillas and with political prisoners. The testimony of Professor Terry Karl, an expert with impressive credentials that the Service does not challenge, was extensive and persuasive. She testified that government security forces would view the petitioner's visits to the prisons housing her family members as very political acts; that the lists on which visitors signed their names were held by the "death squads;" that the death squads target and kill relatives and close associates of members of guerrilla organizations; that she personally knew of several examples of non-political family members of guerrillas who were killed by death squads. Prof. Karl's testimony linked Ms. Ramirez's conduct to larger patterns of politically motivated violence to show that her conduct endangered her personally. In addition to Prof. Karl's testimony, the petitioner presented a cable from the American Embassy in El Salvador to the State Department. The cable reported that an Embassy officer visited a political prison and found an "apparently genuine concern among the prison[ers] . . . about their 'targeted families.'" The cable also reported threats published in a rightist newspaper to the effect that if a group called "Mothers of Prisoners" did not stop publishing notices in the newspaper about their prisoner relatives, they would face "reprisals."

In response to Ms. Ramirez's argument that visits to prisons would be viewed as a highly political act and would thus put her in danger, the BIA stated in its decision that because the prisoners themselves were released from incarceration in 1983 under a general amnesty, "it can hardly be expected" that a person who visited them would be in danger. The Board's argument assumes that incarceration is the only form of persecution in El Salvador and that release removes former prisoners from danger of persecution. Yet Prof. Karl testified to the contrary, and the BIA gave no reason for rejecting her testimony on this issue. She testified that there were many

instances of persecution of released prisoners and that, in fact, prisons were among the safest places for dissidents in El Salvador because the prisons were under close and constant scrutiny by human rights organizations. The cables from the embassy to the State Department corroborate Prof. Karl's testimony. They state that the prisoners' most significant complaints were violent interrogation tactics *before* admission to prison and persecution of family members.

In its brief the Service does not rely on the BIA's reasoning that the release of political prisoners insures that they and their families won't be persecuted; rather, it makes the argument that Ms. Ramirez's visits could not have put her in danger because she was not detained after any of the visits. But Prof. Karl testified that the prison sites were themselves relatively safe, that Ms. Ramirez visited during the day and that the death squads operated under cover of night. The Service presents no evidence that calls Prof. Karl's testimony into question, nor does it suggest any fallacy in her testimony on this point.

In *Bolanos–Hernandez*, 767 F.2d at 1284–85, this court remarked on the problems of proof in asylum cases and held that credible evidence of general conditions pertaining in a country, such as that presented in Prof. Karl's testimony, should be considered by the BIA, along with any more specific evidence presented. In this case the BIA did not explain why it ignored several aspects of Prof. Karl's testimony. It only said that the background evidence "does not establish an adequate factual basis to conclude that *all* family members of guerrillas, suspected guerrillas, or members of opposition organizations in El Salvador, by virtue of that situation alone have a well-founded fear of persecution." (Emphasis added). Ms. Ramirez does not attempt to argue that *all* family members of guerrillas are eligible for withholding of deportation. Nor did Prof. Karl make that assertion in her testimony. Ms. Ramirez has established that she is not just any family member of a guerrilla or opposition-

ist: she has a cousin who, though a guerrilla, was not killed in combat but was dragged from his house in the middle of the night and executed extrajudicially; she has a half brother, a non-combatant propagandist, who was tortured; she has an uncle who was disappeared; she has a neutral father who was shot; she has an apolitical friend who was dismembered. She has reached an age that renders her suspect, especially since everyone in her family close to her in age has been involved in anti-government activity. Most importantly, she is also an easily identifiable target, because her surname is notorious in her small village and because she has signed visitors' lists at two political prisons. Ms. Karl's testimony was not in the nature of a general diatribe against conditions in El Salvador; rather, she distinguished Ms. Ramirez's case from the hypothetical case that the BIA advanced of someone whose *only* basis for fear was a family relationship to a guerrilla.

The Service, in addition to arguing that the evidence Ms. Ramirez presented is insufficient to prove her case, points to evidence that it believes establishes that Ms. Ramirez does not face a likelihood of persecution.

The Service first argues that because the authorities had an "opportunity to persecute" Ms. Ramirez beginning with the death of her cousin Luis in August, 1980 and because the security forces did not seize the opportunity during the two and one-half year period between that date and her departure from El Salvador in February of 1983,[4] she therefore cannot reasonably fear persecution.

The Service's factual premise is faulty. The death of Luis was certainly an important event, but with the death, imprisonment, or torture of each succeeding relative or associate, the probability that Ms. Ramirez mistakenly would be assumed to be a guerrilla or sympathizer likely increased. The record in this case indicates that the Salvadoran security forces apparently have no reliable procedure for separating the politically "guilty" from the po-

---

**4.** During this period, Ms. Ramirez was between thirteen and fifteen years old.

litically "innocent," and that family connections are often used as a proxy for individualized investigation of subversive activity. Moreover, the threat to Ms. Ramirez reached its apogee just three months before she left the country. It was only in late 1982 that she began visiting the prisons housing her family members. The security forces in El Salvador perceive visits to political prisoners as political acts. Ms. Ramirez testified that she took the risk of visiting the prisons and signing her name on the visitors' list only because she knew she would be leaving the country. Her mother, who did not plan to leave, did not take that risk.[5] Thus the window of opportunity to persecute Ms. Ramirez opened much wider just a few months before she left Salvador. When the issue is framed in terms of a few months rather than a few years of opportunity, the strength of the inference that security forces will never persecute her diminishes. During those final months in El Salvador, Ms. Ramirez, fearing reprisals from death squads, alternated sleeping at her mother's and father's houses in order to reduce her chance of being captured.

Unless it is the case that the security forces in El Salvador strike rapidly or not at all, the fact that Ms. Ramirez remained unharmed for a few months while she prepared to leave the country has only marginal probative value. Prof. Karl testified that security forces in El Salvador do not always operate efficiently. The Service offered no evidence to the contrary. In *Rodriguez–Rivera v. INS*, 848 F.2d 998 (9th Cir.1988), the court stated that the BIA was entitled to consider evidence of a short period during which the alien was not persecuted as relevant, but there were several other facts in that case that undermined the alien's claim of persecution—the two most notable being that the only person who threatened the alien and who knew where he lived subsequently died, and that the alien's credibility was in doubt. Moreover, there was no evidence in *Rodriguez–Rivera*, as there is here, that during the period in question, the alien was making some effort to avoid the authorities.

In *Damaize–Job*, 787 F.2d at 1336, the petitioner's ability to remain unharmed for two years in the country from which he had fled did not defeat his claim that he faced a clear probability of persecution were he to return again. In *Rodriguez v. INS*, 841 F.2d 865 (9th Cir.1987), the petitioner fled El Salvador after several of her politically-active family members had been attacked by the guerrillas. She had left her boy in El Salvador under the care of a friend, and when the friend died, she returned to her boy. She stayed in El Salvador for six months while she raised the money needed to come back to the United States. Despite the six month stay, during which she alleged no acts of persecution, this court found that there was "obviously more than sufficient [evidence] to make out a prima facie case of persecution[.]" 841 F.2d at 871. *Rodriguez–Rivera, Damaize–Job*, and *Rodriguez*, read together, indicate that evidence of a short period without persecution is relevant but not sufficient to undermine an otherwise strong case. Even refugees in the clearest danger of persecution may be able to avoid the authorities for some time before they leave the country. The Immigration Act should not be read to require that a refugee's persecutors be in hot pursuit of him as he flees the country.

---

5. The BIA reasoned that because the petitioner's mother, although known to be the mother of guerrillas, was not physically harmed by the authorities, it necessarily followed that the petitioner herself, as the known sister of guerrillas, was also in no danger. In so doing, it ignored not only the fact that Ms. Ramirez, unlike her mother signed the prison lists, but also important general distinctions set forth in the record between the situations of young and old women in El Salvador. Young women are far more likely to be involved in anti-government activities. The guerrillas recruit young women— some in their early teens—to perform certain tasks for them. Moreover, as Terry Karl, the expert witness, testified, "[W]hen there is some reason to go after the family ... part of the attraction of Death Squad activity ... is that they have a consistent pattern of raping and killing young women of [Ramirez's] age who are targeted." In contrast, older women, especially mothers, are not as frequently targeted. Ms. Ramirez's mother has eight children, two of whom are very young. Mothers of small children are not the most popular among possible candidates for targets of persecution and terror.

A second argument that the Service offers for denying Ms. Ramirez's claim is that she has not shown that she is "similarly situated" to the family members who were persecuted; in other words, since Ms. Ramirez is not politically active and her persecuted family members are, she cannot show that her family's beliefs will be imputed to her. The Service argues that in *Hernandez–Ortiz* and *Rodriguez,* the court found that prima facie showings of entitlement to withholding of deportation had been made only because the alien was "similarly situated" to the family members whom she alleged were persecuted. In *Hernandez–Ortiz,* argues the Service, no one in the family was politically active. In *Rodriguez,* every member was. Since in this case, argues the Service, Ms. Ramirez's political stance of neutrality differs from that of her persecuted family members, *Rodriguez* and *Hernandez–Ortiz* do not control.

There are three problems with the Service's attempt to make this distinction. First, in neither *Rodriguez* nor *Hernandez–Ortiz* is it clear that the asylum applicant was in fact in the same situation as the rest of her family. Neither court discussed the issue or even stated the applicant's political affiliation. The Service simply assumes the family members were similarly situated.

Second, the rule that the Service would have us derive from this distinction, assuming the distinction exists, is irrational. An applicant who alleged both that family members had been targeted and that neither she nor anyone in her family was involved in political activity would have a stronger case than an apolitical applicant whose targeted family members *were* in fact politically active. Yet in the former case, the inference that the applicant's family was the victim of *political* persecution rather than the victim of ordinary violence seems less, not more, reasonable than in the latter case. Were we to accept the Service's distinction, the apolitical member of a political family would have an unjustifiably difficult burden of proving persecution. The principle articulated in *Hernandez–Ortiz,* that persecution for falsely im-

puted political beliefs can be a basis for both asylum and withholding of deportation, would be severely undercut.

The third problem with the Service's reliance on the distinction is that even if the court accepts it, it does not necessarily help the Service in this case. Ms. Ramirez is not in a substantially different situation from some of her family members and associates who have been victimized. Her father did not take an active political stand, but rather provided food to the needy— some of whom may have been guerrillas. The Service acknowledges the exception of her father ("With the exception of her father, all of petitioners relatives who suffered at the hands of the security forces were involved in the guerrilla movement ..." Resp. Br. at 17), but does not discuss its implications. It also fails to account for Pedro Bolanos, who was executed despite his apolitical stand. If Bolanos was assassinated because of his association with the politics of the family of Ms. Ramirez's aunt, who sympathized with the guerrillas, it follows that the security forces might make the same mistake with regard to Ms. Ramirez herself; she was closer to her aunt's family than was Bolanos. Although Bolanos was not a member of Ms. Ramirez's family, that does not detract from her claim of persecution on the basis of imputed political opinion.

## B.

Because the Board found no reasonable possibility of persecution on any of the five statutorily impermissible bases, it rejected the petitioner's claim for asylum and thus rejected *a fortiori* her claim to withholding of deportation, which requires a showing of a greater likelihood of persecution than is required to establish eligibility for asylum.

We hold that Ms. Ramirez has met the standard for establishing withholding of deportation. She has shown that it is more likely than not that she will be persecuted if returned to El Salvador. In *Rodriguez,* the case most closely on point, the petitioner, a Salvadoran woman, alleged that several members of her family had been killed

by the guerrillas in retaliation for her family's association with the government-supported rural militia. Although no threat of violence was directed specifically at her either before she initially left El Salvador or in a six month period during which she had temporarily returned to get her boy, her allegations were held to be "obviously more than enough to make a prima facie case under 'the well-founded fear standard' *as well as the stricter 'clear probability' test."* *Rodriguez,* 841 F.2d at 871 (emphasis added). It is true, as the government points out, that the question before the court in *Rodriguez* was whether a prima facie case was established and not whether the Board's conclusion was supported by substantial evidence. But in this case, Ms. Ramirez's testimony was extensive, detailed, specific, and fully credited. Moreover, the expert testimony of Prof. Karl in this case is highly persuasive on the clear probability issue. The government did not rebut Ms. Ramirez's evidence. The Board's conclusion was not supported by substantial evidence.

Prof. Karl identified several circumstances that would make the petitioner a particularly likely target of politically-motivated punishment, the most important being her membership in a notorious family in her village, her age, and her visits to prisons. She also testified that the death squads were focusing their wrath on more specific groups than previously, and that one of these groups was family members of guerrillas. As noted above, she testified that *young women in suspect families were* particularly at risk, because the death squads raped them and advertised this fact to attract members. In response to a question about the probability that Ms. Ramirez would be persecuted if deported, Prof. Karl testified that she would not put a percentage on the probability but that it was "more probable than not that she would be persecuted, disappeared, murdered, or [be the victim of] some other activity against her."

Ordinarily the court would defer to the Board on a question of degree of probability of persecution, but the Board did not discuss the degree of probability since it felt that the kind of persecution Ms. Ramirez was alleging was not persecution on the basis of political opinion. Since, as we have discussed, the Board misread our cases concerning what constitutes political persecution, it did not apply the correct legal principles to the evidence before it. Had the Board applied those principles, it could not have found substantial evidence to support the conclusion that it reached in this case. Viewing the evidence in light of the correct legal principles, we find there was overwhelming evidence that Ms. Ramirez faces a clear probability of persecution in El Salvador. *A fortiori,* Ms. Ramirez has established her eligibility for asylum. *See Damaize-Job,* 787 F.2d at 1339.

The petition for review is granted, the decision of the BIA reversed, and the case remanded. The Board is directed to grant the petition for withholding of deportation, and, with respect to the petitioner's asylum application, to exercise its discretion under § 208 of the Immigration and Nationality Act.

REVERSED and REMANDED.