Blanca Rosa
**ECHEVERRIA–HERNANDEZ,**
Petitioner,

v.

**U.S. IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 89–70236.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 4, 1990.

Decided Jan. 14, 1991.

Linton Joaquin, Central American Refugee Center, Los Angeles, Cal., for petitioner.

Mary A. Sedgwick, Asst. U.S. Atty., Los Angeles, Cal., for respondent.

Before WALLACE, ALARCON and POOLE, Circuit Judges.

WALLACE, Circuit Judge:

Echeverria–Hernandez petitions for review of the decision of the Board of Immigration Appeals (Board) denying her request for asylum and withholding of depor-

tation. The Board had jurisdiction pursuant to 8 C.F.R. §§ 3.1(b)(2), 242.21 (1990). We have jurisdiction over this timely filed petition pursuant to 8 U.S.C. § 1105a. We deny the petition.

## I

Echeverria–Hernandez is a native and citizen of El Salvador. She last entered the United States on January 29, 1985, and, on June 30, 1985, she was served with an order to show cause, alleging her deportability. One month later, she appeared at a deportation hearing with counsel, refused to answer most questions regarding her deportability, but admitted she was not a citizen or national of the United States. The immigration judge denied her application for asylum and withholding of deportation. Echeverria–Hernandez timely appealed to the Board, which dismissed the appeal.

Echeverria–Hernandez is not a member of any political organization. She has not served in either the armed forces or its armed opposition. She is politically neutral. Echeverria–Hernandez testified that in 1979, her cousin, who was a guerrilla, was killed by persons acting on behalf of the Salvadoran government. According to Echeverria–Hernandez's testimony, her cousin's mother was present at the killing, but was unharmed. Echeverria–Hernandez also testified to the deaths of her brother in 1979 and her father in 1985. Both men were killed by unknown persons for unknown reasons.

Echeverria–Hernandez has never been contacted or threatened by either side in the Salvadoran conflict. The immigration judge found that Echeverria–Hernandez's claimed fear was based primarily on the general conditions of violence in El Salvador.

## II

■ Section 243(h) of the Immigration and Nationality Act (Act), 8 U.S.C. § 1253(h), requires the Attorney General to withhold deportation "if the Attorney General determines that the alien's life or freedom would be threatened . . . on account of race, religion, nationality, membership in a particular social group, or political opinion." Section 243(h) is a mandatory provision which entitles the alien to a withholding of deportation upon proof of a clear probability of persecution. *Diaz–Escobar v. INS*, 782 F.2d 1488, 1491 (9th Cir.1986) (*Diaz–Escobar*). We review the Board's decision to grant or deny the withholding of deportation for substantial evidence. *Id.* at 1491–92.

■ Section 208(a) of the Act, 8 U.S.C. § 1158(a), gives the Attorney General discretion to grant political asylum if the Attorney General determines the alien to be a refugee within the meaning of section 101(a)(42)(A) of the Act, 8 U.S.C. § 1101(a)(42)(A). Like section 243(h), section 101(a)(42)(A) requires proof of persecution on account of "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). To establish asylum eligibility, however, the alien need not meet the clear probability test. *Diaz–Escobar*, 782 F.2d at 1491. Rather, the alien need only prove a well-founded fear of persecution. *De Valle v. INS*, 901 F.2d 787, 790 (9th Cir.1990). A well-founded fear must be both subjectively and objectively reasonable. *See id.* The subjective component requires a showing that the alien's fear is genuine. *Id.* The objective component requires a showing, by credible, direct, and specific evidence in the record, of facts that would support a reasonable fear of persecution. *Id.* We review the Board's denial of asylum eligibility for substantial evidence. *Id.*

Under each deferential standard, we may not reverse the Board simply because we disagree with its evaluation of the facts, but only if we conclude that the Board's evaluation is not supported by substantial evidence. *See id.* This standard requires only that the Board's conclusion, based on the evidence presented, is substantially reasonable. *See id.*

The Board found that Echeverria–Hernandez failed to meet her burden of proof under either the clear probability or well-

founded fear standard. We will first review this finding under the more generous well-founded fear standard. If substantial evidence supports the Board's finding as it relates to well-founded fear, we need not separately review it in light of the more stringent clear probability standard; Echeverria–Hernandez's failure as to the former would necessarily demonstrate her failure as to the latter. *See id.*

## III

■ Echeverria–Hernandez points to the deaths of her cousin, father, and brother in support of her claim of well-founded fear. Accepting this fear as subjectively genuine, we analyze it for objective reasonableness. In *Ramirez Rivas v. INS,* 899 F.2d 864, 868–72 (9th Cir.1990) (*Ramirez Rivas* ), we held that a claim for withholding of deportation may be based on acts of political persecution endured by family members. Ramirez Rivas proved that members of her family had been persecuted for their political opinions. *Id.* at 868. She also proved that other members of her family had been persecuted, notwithstanding their lack of a publicly articulated political belief, because one had been imputed to them. *Id.* Hence, we held that Ramirez Rivas had demonstrated a clear probability of persecution, despite her own political neutrality. *Id.* at 866, 873.

Echeverria–Hernandez's cousin was a guerrilla. Echeverria–Hernandez testified that her cousin was killed by persons acting on behalf of the government of El Salvador. Echeverria–Hernandez contends this killing sustains her claim of a well-founded fear. She does not allege any particular factors that would relate this risk specifically to her. Rather, her claim seems to rest on the notion that the death of her cousin gives rise to asylum eligibility for all members of the cousin's extended family.

This claim lacks factual support. The mother of Echeverria–Hernandez's cousin was present when her daughter was killed, yet was unharmed. Echeverria–Hernandez herself lived in El Salvador for more than five years after her cousin was killed, free from harassment or even contact by either side in the conflict, a fact which was properly considered by the Board in determining the likelihood of persecution. *See Rodriguez–Rivera v. INS,* 848 F.2d 998, 1006 (9th Cir.1988). Thus, Echeverria–Hernandez's claim is unsubstantiated.

Moreover, her claim is legally overbroad. The death of one family member does not trigger a sweeping entitlement to asylum eligibility for all members of her extended family. While *Ramirez Rivas* holds that familial political persecution may support a claim for withholding of deportation, this is not a broad proposition of general applicability. *Ramirez Rivas* involved a family engaged in an extraordinary level of political activity and subject to repeated acts of political persecution. *See Ramirez Rivas,* 899 F.2d at 865–66. *Ramirez Rivas* turns on these facts, which are not present here. Echeverria–Hernandez's cousin was killed in 1979, after which Echeverria–Hernandez claims no further acts of political persecution to her or her family. The death of her cousin simply does not justify an objective well-founded fear to Echeverria–Hernandez.

Echeverria–Hernandez offered no proof that the killing of her father or brother was politically motivated. Both were killed by unknown persons for unknown reasons. Hence, there is no reason to conclude from their deaths that Echeverria–Hernandez is now threatened with political persecution. It is not enough that Echeverria–Hernandez or her family has been subjected to general conditions of political unrest. *See Sanchez–Trujillo v. INS,* 801 F.2d 1571, 1577 (9th Cir.1986). Without proof of political motive, the killings of her father and brother cannot form the basis for a claim of well-founded fear of political persecution.

The Board found that Echeverria–Hernandez failed to prove a well-founded fear of persecution. This finding is supported by substantial evidence, and therefore, must be affirmed. We need not separately consider whether Echeverria–Hernandez has proved a clear probability of persecution; her failure as to the well-founded fear

standard necessarily demonstrates her failure as to the clear probability standard. We affirm the Board's denial of political asylum and withholding of deportation.

## IV

■ Before the Board and again before this court, Echeverria–Hernandez has urged the applicability of international law to the facts of this case. She raises a question of first impression in this court, although one which has been considered elsewhere. *See, e.g., Garcia–Mir v. Meese,* 788 F.2d 1446 (11th Cir.), *cert. denied,* 479 U.S. 889, 107 S.Ct. 289, 93 L.Ed.2d 263 (1986); *American Baptist Churches in the United States v. Meese,* 712 F.Supp. 756 (N.D.Cal.1989); *cf. United States v. Aguilar,* 883 F.2d 662 (9th Cir.1989) (*Aguilar*). The Board rejected Echeverria–Hernandez's contention. As this ruling involves a question of law, we review it de novo. *See United States v. McConney,* 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

Echeverria–Hernandez contends that *The Paquete Habana,* 175 U.S. 677, 20 S.Ct. 290, 44 L.Ed. 320 (1900), provides license for the judicial adoption of international immigration norms. In *The Paquete Habana,* the Court stated:

> International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction.... For this purpose, where there is no treaty, and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of civilized nations....

*Id.* at 700, 20 S.Ct. at 299. Obviously, this passage does not contemplate the judicial surrender of our country's political sovereignty. *See Aguilar,* 883 F.2d at 679. Rather, it states a more modest proposition: in the absence of constitutional or statutory provisions, case law, treaties, or controlling executive action, courts may rely on other sources of legal standards, such as restatements or the work of other commentators or international organizations. The need for such reliance was per-

haps great at the time of *The Paquete Habana.* Today, however, there are few areas of the law left untouched by "treaty, ... controlling executive or legislative act or judicial decision."

The quoted passage itself imposes two requirements for the incorporation of international law into judicial decisions. First, there must exist a valid proposition of international law, which we take to mean a specific, binding rule of general international acceptance. As Justice Harlan stated for the Court in *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 428, 84 S.Ct. 923, 940, 11 L.Ed.2d 804 (1964):

> [i]t should be apparent that the greater the degree of codification or consensus concerning a particular area of international law, the more appropriate it is for the judiciary to render decisions regarding it, since the courts can then focus on the application of an agreed principle to circumstances of fact rather than on the sensitive task of establishing a principle not inconsistent with the national interest or with international justice.

Second, the proposition of international law must not be preempted by the Constitution, treaty, judicial decision, or legislative or executive acts. We have already held that "[i]n enacting statutes, Congress is not bound by international law; if it chooses to do so, it may legislate contrary to the limits posed by international law." *Aguilar,* 883 F.2d at 679 (internal quotations and modifications omitted). This proposition applies with equal force to judicial decisions and executive acts. It is only in the absence of controlling national authority that we look to international law.

### A.

We first consider the existence of a specific, binding rule of general international acceptance. Echeverria–Hernandez contends that international law requires the United States to provide temporary asylum to all persons fleeing internal armed conflict. In support of this proposition, she cites the Geneva Convention IV of 1949, the customs and practices of this and other

nations, and statements of various international bodies and officials.

Echeverria–Hernandez first urges reliance on the Geneva Convention IV of 1949, a multilateral treaty specifying the protections to which civilians are entitled in wartime. *See* Convention Relative to the Protection of Civilian Persons in Time of War (Geneva Convention IV of 1949), 6 U.S.T. 3516, T.I.A.S. No. 3365, 75 U.N.T.S. 287 (Convention). The United States is a signatory to the Convention, as are 163 other nations. Meron, *The Geneva Conventions as Customary Law*, 81 Am.J.Int'l L. 348 n. 2 (1987).

With one exception, the articles of the Convention prescribe a code of conduct for international, not internal, armed conflict. *See* Convention, 6 U.S.T. 3516, T.I.A.S. No. 3365, 75 U.N.T.S. 287. Article three, the only exception, makes rules solely for internal combatants; it does not impose obligations onto noncombatant nations. *See id.* Nothing contained in the Convention purports to regulate the treatment by noncombatant nations of refugees fleeing internal armed conflict. *See id.*

Echeverria–Hernandez nonetheless argues for an extension of the Convention's guarantees to refugees, such as herself, fleeing internal armed conflict. She contends that the Convention is evidence of a binding custom that relates to internal, as well as international, armed conflict. Thus, Echeverria–Hernandez argues that international treaties, in addition to creating express rights between signatory nations, provide evidence of other binding practices and customs. Her contention might be characterized as an invitation to interpret these treaties more expansively than their language properly allows.

Contrary to her contention, the Convention's limitations of scope mean what they say. The existence of article three demonstrates that the Convention separately considered the protections appropriate to civilians threatened by internal armed conflict. If the Convention's silence can mean anything at all, as Echeverria–Hernandez contends, the limited scope of article three is evidence that any broader guarantees in this context were rejected. Thus, the Convention is not a specific, binding rule of general international acceptance, applicable to the facts of this case.

Echeverria–Hernandez asserts, and we agree, that the United States and other nations often have, in times of great tumult, granted temporary asylum to persons fleeing internal armed conflict. *See* Perluss & Hartman, *Temporary Refuge: Emergence of a Customary Norm*, 26 Va. J.Int'l L. 551 (1986) (describing instances of the practice). We are not persuaded, however, that these nations acted in the belief that the practice was required by international law. More plausibly, they acted out of understandable humanitarian concern. These nations, by their conduct, have not relinquished the power to control their own borders, nor do their acts now constitute a waiver of traditional sovereign rights.

Finally, Echeverria–Hernandez urges reliance on the statements of various international bodies and officials. Suffice it to say that these statements, however well-meaning, do not rise to the level of international law. They are potentially persuasive to the extent they accurately describe the law. But they are nothing more. As stated in *The Paquete Habana*, 175 U.S. at 700, 20 S.Ct. at 299, "[s]uch works are resorted to by judicial tribunals, not for the speculations of their authors concerning what the law ought to be, but for trustworthy evidence of what the law really is."

We have considered the statements relied upon by Echeverria–Hernandez and amici curiae. To the extent they describe the humanitarian practice of granting temporary asylum, we agree with their description. We do not, however, agree with those statements implying the existence of a binding rule requiring the practice; these appear to be precisely the sort of speculation about which the Supreme Court warned in *The Paquete Habana*.

### B.

■ There is a second, equally persuasive reason why Echeverria–Hernandez's argument fails. This issue involves

*The Paquete Habana*'s second requirement: that the proposition of international law not be preempted by the Constitution, treaty, judicial decision, or legislative or executive act.

Congress has enacted a comprehensive program for the admission of refugees into this country. Congress has authorized the President to determine the number of refugees to be admitted to the United States each year, upon consideration of humanitarian concerns and the national interest. *See* 8 U.S.C. § 1157 ("Annual admission of refugees and admission of emergency situation refugees"). In addition, Congress has authorized the Attorney General to establish asylum procedures for refugees already present within the United States or at our borders. *See* 8 U.S.C. § 1158. Finally, Congress has required the Attorney General to withhold deportation in certain circumstances. 8 U.S.C. § 1253(h). Congress has, by these enactments, preempted international law in this area.

■ Moreover, the Attorney General has sometimes suspended deportation proceedings against particular groups of aliens through a process known as extended voluntary departure. *Hotel & Restaurant Employees Union, Local 25 v. Smith,* 846 F.2d 1499, 1510 (D.C.Cir.1988) (en banc) (*Smith*). Extended voluntary departure is not explicitly authorized by any act of Congress, but rather is an executive act within the bounds of normal prosecutorial discretion. *See* 8 U.S.C. § 1103(a) (giving Attorney General administrative and enforcement authority). The Attorney General has declined to grant extended voluntary departure to Salvadoran aliens. *Smith,* 846 F.2d at 1510, *citing* Letter from George P. Schultz to William French Smith (June 23, 1983). This express declination is an executive act preempting international law in this area.

Thus, we hold that Echeverria–Hernandez's claim is preempted by both legislative and executive acts. This preemption precludes the application of international law to the facts of this case.

V

Echeverria–Hernandez has failed to prove that the Board's determination of the likelihood of persecution lacks the support of substantial evidence. Thus, she has not demonstrated her eligibility for political asylum or withholding of deportation.

International law affords her no basis for relief. She has failed to prove the existence of a specific, binding rule of general international acceptance. In addition, any such rule would be preempted by legislative and executive acts in this context.

As the Board's determinations of these claims meet the standard of review appropriate to each, Echeverria–Hernandez's petition for review is denied.

PETITION DENIED.