105 F.3d 666
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Oscar Ismael ORTEZ-DERAZ, Petitioner,
v.
IMMIGRATION AND NATURALIZATION SERVICE, Respondent.
 No. 95-70597.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Dec. 9, 1996.
Decided Jan. 13, 1997.
 
 Petition to Review a Decision of the Immigration and Naturalization Service, No. Ase-sjj-ajt.
 BIA
 REVIEW GRANTED; DEPORTATION VACATED.
 
 
 1
 Before: REINHARDT and RYMER, Circuit Judges, and TANNER, District Judge.*
 
 
 2
 MEMORANDUM**
 
 
 3
 Oscar Ismael Ortez-Deraz, a 31-year-old native and citizen of El Salvador, petitions this court for review of a final order of the Board of Immigration Appeals ("Board") denying his request for asylum and withholding of deportation. We conclude that Ortez has established a well-founded fear of persecution on account of political opinion, and that the Board's finding to the contrary is unsupported by substantial evidence. Accordingly, we remand to the Board so that it may determine, within its discretion, whether to grant him asylum.
 
 
 4
 Where, as here, the Board conducts its own review of the record, makes its own findings, and independently determines the sufficiency of the evidence, we review the determinations of the Board, not those of the immigration judge. Surita v. INS, 95 F.3d 814, 819 (9th Cir.1996); Castillo v. INS, 951 F.2d 1117, 1120-21 (9th Cir.1991). Factual findings supporting an asylum determination are reviewed under a substantial evidence standard, Turcios v. INS, 829 F.2d 720, 723 (9th Cir.1987), and we will reverse such a determination if "no reasonable factfinder could fail to find the requisite fear of persecution." INS v. Elias-Zacarias, 502 U.S. 478, 484-85 (1992). To the extent that the IJ explicitly found Ortez's testimony to be credible, we accept that testimony as true, and in the absence of explicit credibility findings, "we will presume that the Board found the petitioner credible." Damaize-Job v. INS, 787 F.2d 1332, 1338 (9th Cir.1986); see also, e.g., Turcios v. INS, 829 F.2d 720, 723 (9th Cir.1987).
 
 
 5
 Because the parties are familiar with the facts, we will not review them in detail here. Rather, we emphasize Ortez's testimony that (1) his name was on a guerilla hit list "principally" because he "sympathized with the military"; (2) his sister Flor, whose name was on the hit list, was kidnapped and executed by the guerillas; (3) a member of his patrol unit, Lito Amaya, whose name was on the hit list, was kidnapped and executed by the guerillas; (4) several other members of his family, which is well known for its support of and ties to the military, were also killed by the guerillas; and (5) he survived for several years in El Salvador by taking precautions in order to avoid detection by the guerillas, such as moving constantly, traveling only late at night or in the early morning, and spending his days and nights in different places.
 
 
 6
 * Ortez's testimony that he was placed on a hit list for political reasons by a nationwide organization of armed guerillas, which we must accept as true, demonstrates a well-founded fear of persecution on account of political opinion. Indeed, his case is comparable to others in which we have found a clear probability of persecution, a more difficult standard to satisfy that entitles a petitioner to withholding of deportation. See, e.g., Rodriguez v. INS, 841 F.2d 865, 871 (9th Cir.1987) (reversing the Board and finding a clear probability of persecution where the petitioner, a Salvadoran woman, attributed the killings of family members to the guerillas "in retaliation against her family's association with the government-supported rural militia"); Canjura-Flores v. INS, 764 F.2d 885, 889 (9th Cir.1985) (finding a clear probability of persecution on the basis of the petitioner's testimony that the Salvadoran government sought out all members of the Popular League, that he was a known member of the Popular League, and that he was "specifically sought out by the National Guard at his home"). See generally Aguilera-Cota v. INS, 914 F.2d 1375, 1381-82 (9th Cir.1990) (discussing five cases involving threats of violence to Salvadorans in which the petitioner's testimony established a clear probability of persecution).
 
 
 7
 The Board found in this case that Ortez had failed to establish that he had been persecuted "on account of" political opinion or any other ground for which he would be legally eligible for asylum. The basis for this finding is not clear from the Board's decision. Indeed, the Board did not dispute Ortez's testimony that the guerillas placed him on a list of people who were to be either recruited or assassinated. According to the government, the Board concluded that Ortez was simply the target of a guerilla recruitment effort made with no particular regard to his views. However, the Board made no such finding. Rather, it found that the various friends and relatives of Ortez who had been killed by the guerillas had not necessarily been killed on account of their political views. In order to arrive at the position argued by the government, the reader must then infer from this finding that any persecution Ortez himself may have had reason to fear would not have been on account of his political views.
 
 
 8
 Even assuming that the Board made such a finding, there was no reasonable basis in the record for the Board to have rejected Ortez's credible testimony and the corroborating circumstantial evidence that he was placed on the hit list on account of his political views. Ortez testified that the guerillas placed him on a hit list not because they sought to recruit him, but "principally" because they perceived his pro-military views:
 
 
 9
 Q. Why do you think you, Flor, and some other companions of yours, were on the guerilla hit list?
 
 
 10
 A. Principally, because I had participated, because we all sympathized with the military. And Flor, because she was the wife of a bodyguard of a government figure.
 
 
 11
 (Emphasis added.) There is no evidence in the record that contradicts his account of why he was placed on the hit list. Rather, the record corroborates his account insofar as it indicates that the guerillas had every reason to know of his actual and undisputedly pro-military views. First, Ortez testified consistently that his entire family, including himself, was well known for its pro-military sympathies. When asked whether it was "fairly well known" that he and his family "sympathized with the military," he testified that "all the Ortez family is well known in Concepcion Batres, and it is well known that we cooperated with the army" (emphasis added). He confirmed that testimony, in response to another question, later in the proceeding.
 
 
 12
 Ortez's family's involvement with the military was open and extensive and is well-documented by his testimony. One sister, Carmen, was married to a member of the military who died in combat, and then to a member of the Treasury Police who was kidnapped and assassinated by the guerillas. As noted above, his sister Flor was married to a presidential bodyguard and was kidnapped, tortured, and assassinated by the guerillas. Ortez's mother and sisters were actively involved in helping the military by washing and ironing army uniforms and by providing food to the army. Two of his cousins, Francisco Ortez and Carlos Ortez Reyes, were also assassinated by guerillas, and a third cousin, Oscar, was wounded in the same guerilla ambush that claimed Carlos' life. Further, we note that Ortez's views were evidenced not only by the pro-military reputation of his entire family, but also by his own membership in the Civil Defense Patrol in 1983. This participation in the military would have been obvious to the guerillas: his patrol duties required him to keep watch, in uniform, over his hometown.
 
 
 13
 Given this corroborative evidence, the lack of contrary evidence, and the IJ's finding that Ortez was a credible witness, we do not think that a reasonable factfinder could have rejected his testimony that he was placed on the hit list principally on account of his political views. Although there is nothing in the record to suggest that Ortez ever actually told the guerillas of his views, or that the guerillas actually told him why they sought to persecute him, it is clear as a matter of law that a petitioner such as Ortez "cannot be expected to provide direct proof of his persecutors' motives." INS v. Elias-Zacarias, 502 U.S. 478, 483 (1992); see also, e.g., Canjura-Flores v. INS, 784 F.2d 885, 888 (9th Cir.1985) (noting that a petitioner is not required to provide corroborative evidence, independent of his own testimony, that he has been threatened with political persecution); Bolanos-Hernandez v. INS, 767 F.2d 1277, 1284-85 (9th Cir.1984) (same). Nor is it necessary to show more than that the guerillas knew of his views, or that his views were generally well-known. Ortez was required only to produce "some evidence," either "direct or circumstantial," that the persecution he faced was on account of his political views, Elias-Zacarias, 502 U.S. at 483 (emphasis in original), and he has done so here. The only contrary evidence that the Board identifies is Ortez's testimony that the guerillas sought either to "incorporate" their targets or to assassinate them. However, this statement cannot be read in context as evidence of why the guerillas felt compelled either to "incorporate" or to assassinate their targets. Ortez immediately followed this statement with his testimony that he, Flor, and Lito were placed on the hit list "principally" because they "sympathized with the military" (and, in Flor's case, for the additional reason that she was also the wife of a presidential bodyguard). His statement that the guerillas intended either to "incorporate" or to assassinate them merely reflects the fact that political persecutors would have had no further reason to kill any individuals who capitulated to them and were willing to join their cause. There is no indication that any of those on the hit list actually did so, or that the guerillas thought that any of them would.
 
 II
 
 14
 The Board's alternative holding that Ortez has no well-founded fear of persecution because he was able to live safely in El Salvador in the past is also unsupported by substantial evidence. Ortez testified that he took extensive precautions in order to avoid detection by the guerillas, such as concealing his identity, moving continuously from city to city, traveling only late at night or early in the morning, spending his days and nights in different places, and returning to his hometown only under cover of darkness and for no longer than two days at a time. He also testified that he remained in El Salvador only until his sister had saved enough money to pay for his journey to the United States. The Board did not dispute this testimony but simply insisted that he "was able to live safely in other parts of El Salvador." The fact that Ortez was able to avoid detection by the guerillas for a period of years, however, does not mean that he did not face persecution: "Even refugees in the clearest danger of persecution may be able to avoid [their persecutors] for some time before they leave the country." Ramirez Rivas v. INS, 899 F.2d 864, 871 (9th Cir.1990). In this case, the Board has "fail[ed] to distinguish fortitude in the face of danger from absence of fear." Singh v. Moschorak, 53 F.3d 1031, 1034 (9th Cir.1995). The fact that Ortez hid for a period of years indicates not a lack of danger, but the gravity of the danger that he perceived. Indeed, even if Ortez had not been in hiding, the mere fact that his would-be persecutors failed to harm him for some period of time "is relevant but not sufficient to undermine an otherwise strong case of persecution." Ramirez Rivas, 899 F.2d at 871 ("The Immigration Act should not be read to require that a refugee's persecutors be in hot pursuit of him as he flees the country."); see also, e.g., Damaize-Job v. INS, 787 F.2d 1332, 1336 (9th Cir.1986) (finding clear probability of persecution notwithstanding the fact that the petitioner had remained for two years in his home country unharmed); Rodriguez v. INS, 841 F.2d 865, 871 (9th Cir.1987) (finding prima facie case of eligibility for both asylum and withholding of deportation notwithstanding petitioner's return to El Salvador to get her child and an ensuing six-month stay to raise enough money to return to the United States).
 
 
 15
 For similar reasons, the Board's finding that Ortez could not live safely in other parts of El Salvador is not supported by substantial evidence. Ortez testified credibly that he was only able to avoid the guerillas by hiding, taking precautions while traveling, and by moving from place to place, and the incident at his cousin's gravesite shows that the danger he faced was not limited to his hometown of Concepcion Batres.
 
 IV
 
 16
 While the Board took "administrative notice" of improved general conditions in El Salvador following the signing of peace accords in 1992, it did not rest its decision on the effect of these changes. Rather, it invoked changed country conditions only to suggest that Ortez should be able to "return again to his homeland and live safely as he did in admittedly much more turbulent times." On remand, the Board may conclude on the basis of changed country conditions that Ortez's fear of persecution is no longer reasonable or "well-founded." In order to do so, however, it must engage in an "individualized analysis" that demonstrates that "changed conditions ... have eliminated the basis for [the alien]'s individual fear of future persecution." Osorio v. INS, 99 F.3d 928, 933 (9th Cir.1996); Berroteran-Melendez v. INS, 955 F.2d 1251, 1257 (9th Cir.1992) (citing Kacmarczyk v. INS, 933 F.2d 588, 593-94 (7th Cir.1991)). Thus, in this case, it would have to explain how improved conditions for the general population would cure the probability of persecution faced by someone such as Ortez who had been specifically targeted for assassination by the guerillas, and it would also have to consider Ortez's documentary evidence that individuals who were specifically at risk prior to the peace accords of 1992 continue to be at risk. The Board cannot conclude that Ortez is no longer eligible for asylum, however, solely on the basis of the observation that he should be able to "live safely" in El Salvador "as he did in admittedly much more turbulent times."[1]
 
 V
 
 17
 The petition for review is granted. Petitioner is eligible for asylum. The order of deportation is vacated, and the matter is returned to the Board of Immigration Appeals for further action in conformance with this disposition.
 
 
 18
 Petition for review GRANTED; order of deportation VACATED; REMANDED for further proceedings.
 
 
 
 *
 The Honorable Jack E. Tanner, Senior United States District Judge for the Western District of Washington, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 The Board also asserted, on the basis of the Salvadoran government's newfound "commit[ment]" to "combating ... politically motivated violence," that Ortez "may now be able to seek protection and recourse from the Salvadoran authorities in the event that he experiences difficulties." However, the possibility that Ortez could seek government protection does not resolve the question of his eligibility for asylum. The Immigration and Nationality Act defines a "refugee," in relevant part, as someone who is "unable or unwilling to avail himself or herself of the protection of" his or her home country. 8 U.S.C. § 1101(a)(42) (emphasis added). It is obvious from his testimony that Ortez is "unwilling" to rely on the protection of the Salvadoran authorities. If the Board wishes to rely even in part on the possibility that Ortez may be able to seek government protection, it must, at the very least, contend with the evidence in the record that he cannot seek protection from the police because his former persecutors have joined their ranks. In such case, the Board must contend not only with Ortez's credible testimony, but also with the State Department's 1992 report to the Senate Foreign Relations Committee on human rights practices in El Salvador, A.R. at 250, which specifically notes that former guerilla combatants are to comprise 20% of the reconstituted National Police