Mario ERNESTO NAVAS, Petitioner,

v.

IMMIGRATION AND
NATURALIZATION SERVICE,
Respondent.

No. 98–70363.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 1, 1999

Filed June 20, 2000

L. Walker Van Antwerp, III, Los Angeles, California, for the petitioner.

Heather Phillips, United States Department of Justice, Office of Immigration Litigation, Washington, D.C., for the respondent.

Before: BRIGHT,[1] REINHARDT, and TROTT, Circuit Judges.

REINHARDT, Circuit Judge:

Mario Ernesto Navas seeks review of the BIA's decision denying both asylum and withholding of deportation. Navas fled El Salvador at age 17 after members of the Salvadoran military murdered his aunt, shot at him, threatened him with death, and assaulted his mother. Previously, in 1988, Navas's uncle, a member of the Frente Farabundo Marti para la Li-

---

1. The Honorable Myron S. Bright, Senior Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

beracion Nacional (FMLN), a guerilla group opposed to the government, was murdered because of his membership in that group. The IJ and, in turn, the BIA denied Navas's application for asylum and withholding of deportation. The BIA based its decision upon two grounds: first, that Navas had not demonstrated persecution; and second, that, even if the incidents in question rose to the level of persecution, they were not committed on account of Navas's political opinion. Because the evidence would compel any reasonable fact-finder to reach a contrary conclusion with respect to both points, we reverse.

## FACTUAL BACKGROUND

Mario Ernesto Navas is a 26 year old native and citizen of El Salvador. He arrived in this country on September 8, 1992, and applied for asylum and withholding of deportation pursuant to Section 208 and 243(h) of the Immigration and Nationality Act ("INA") two months later. *See* 8 U.S.C. §§ 1158 and 1253(h).

The facts upon which Navas's claim is based are simple. Navas left El Salvador as a seventeen-year old because he feared that the same members of the Salvadoran military who had murdered his aunt and attacked him would in turn murder him. On June 9, 1992, Navas was walking towards his aunt's house when he saw three men leaving her home. He recognized the three men as members of the military forces that were stationed in his home town. When Navas saw the three men, they also spotted him. They chased him and shot at him. However, Navas was able to escape and hide out until the next day, when his mother went to his aunt's home and found that his aunt had been murdered.[2] On the same day that his mother found his aunt's body, the three soldiers who Navas had seen leaving his aunt's house went to his mother's home in search of him. When they discovered that he was not there, they beat his mother and threatened to kill both mother and son unless Navas left the country. Navas left El Salvador that same night—one day after the murder of his aunt.

At the asylum hearing held in early January 1997, Navas testified that his family had been politically active prior to his aunt's murder. His aunt's husband, Navas's uncle, had been a member of the Frente Farabundo Marti para la Liberacion Nacional ("FMLN"), a guerilla group opposed to the Salvadoran government and had been murdered because of his membership in that group. Navas himself had been politically active while in El Salvador, although he was only seventeen when he left the country. According to Navas, he helped distribute political propaganda in his home town. He also testified that the three soldiers who threatened him knew that he had distributed political materials.[3]

2. The record contains a death certificate for Navas's aunt, Victoria Manuela Navas Guerra.

3. In his written asylum application, Navas indicated that neither he, nor any member of his family, belonged to, or was associated with, any group or organization in El Salvador. He also responded that neither he nor any family member had ever been threatened, mistreated, arrested, detained, or interrogated by the authorities in El Salvador. However, Navas testified during his deportation proceeding that he did not reveal any political affiliations or abuse by authorities because he feared such information would affect his application adversely. As for the comments that no one in his family had been abused or persecuted by the government, Navas's own answers to other questions in which he mentioned the murder of his aunt by the military make it clear that Navas simply misunderstood the question or erred in filling out of the form. Most important for our purposes, neither the IJ nor the BIA made any adverse credibility finding. To the contrary, the IJ found that the petitioner was "severely traumatized" by the events that precipitated his flight. See *infra* at following paragraph of text. Where the BIA does not make an explicit adverse credibility finding, we must assume that the applicant's factual contentions are true. *Gaya Prasad v. INS*, 101 F.3d 614, 616 (9th Cir.1996).

Since Navas's flight to the United States, the surviving members of his family have left his home town in El Salvador and are now here.[4] In El Salvador, however, the soldiers who murdered his aunt, beat his mother and threatened his life have been incorporated into the national civil police. As a result, Navas fears the consequences of returning to El Salvador. In fact, the IJ noted Navas's emotional state at the time of testimony: "For the record, the respondent has shown that this is an emotional experience for him. He is crying ... and I think the record should reflect that the respondent does show that he is severely traumatized by the event that occurred...."

As part of the administrative record, Navas submitted extensive materials documenting the prevalence of human rights violations in El Salvador by both the government and its opponents. These documents substantially corroborate Navas's account. For example, the 1992 report, The Work of Americas Watch, notes with respect to El Salvador the "steady diet of assassinations, abductions and violations of the laws of war.... [T]he army and security forces remained responsible for numerous cases of torture, illegal detention, and indiscriminate attacks on the civilian population." *The Work of Americas Watch*, 213 (1992). According to the report, "available evidence demonstrates that some military actions have been aimed directly at civilians living in conflict zones, apparently to punish them for presumed guerilla sympathies." *Id.* at 217. The report also notes the complete immu-

nity with which the military typically acted.

On January 16, 1992, the government of El Salvador and the FMLN signed a peace accord ending 12 years of civil conflict. By the end of 1992, however, the implementation of the accord was in serious jeopardy. Although the reports in the record acknowledge that human rights abuses diminished, politically motivated killings and death threats continued to be commonplace. In fact, the pattern of attacks against those engaged in opposition political activity *increased*.[5] Attacks on FMLN leaders raised suspicions of political motivation, particularly in light of the fact that the attacks went largely unpunished. As the 1993 Americas Watch report puts it, "[t]he near-complete and on-going paralysis of the judicial system continued to ensure that the Salvadoran state, if not guilty of direct involvement in abuses, was complicit by failing to investigate or to take preventive action."[6] The report's conclusion is supported by the fact that members in training of the new National Civil Police included former members of the National Guard and Treasury Police, who were unlikely to police either themselves or their former colleagues rigorously.

Even in 1995, when the FMLN participated in elections as a legal political party, the National Civil Police (PNC) continued to be implicated in killings, torture, and arbitrary detention. Arbitrary executions and death threats still went unpunished. In its 1996 report, Americas Watch notes that, although human rights abuses diminished somewhat, vigilante killings and po-

---

4. Navas testified that his brother is a United States citizen, his mother is a permanent resident, and his father is in the process of becoming a permanent resident. At the time of the hearing, there was a petition pending for Navas.

5. The record includes exhaustive yearly reports by Americas Watch published in 1992, 1993, 1995, and 1996. The 1993 report cites the observations of the United Nations Observer Mission in El Salvador (ONUSAL) regarding the large number of death threats and

murders carried out by the army and security forces.

6. As the report states, "the judicial system ... seems most efficient when it is protecting members of the military from the consequences of their own crimes." Another report cites ONUSAL's observation that 75 of the most prominent cases involving arbitrary executions, attempted executions, and death threats between 1992 and 1994 resulted in neither trial nor punishment for the culprits.

lice abuse continued. Moreover, municipal police forces continued to be associated with serious human rights abuses.

Despite all of the uncontested evidence, both testimonial and documentary, the Immigration Judge ("IJ") denied Navas's application for asylum and withholding of deportation pursuant to Section 241(a)(1)(B) of the INA, 8 U.S.C. § 1251(a)(1)(B). In an oral decision, the IJ concluded that "what the respondent testified to probably happened," and that the issue was whether a claim for asylum could be predicated upon those events.[7] The IJ concluded that it could not, finding that "[t]he respondent fears returning because three men believed he witnessed a murder, a criminal act, and that is not a basis to be granted asylum in the United States." The IJ did, however, grant Navas voluntary departure.

Navas appealed the IJ's decision to the Board of Immigration Appeals ("BIA"), which affirmed the IJ's decision on March 4, 1998. The BIA held first that "the respondent failed to demonstrate that a reasonable person in his circumstances would fear persecution on account of one of the five enumerated grounds for asylum," and second that, as a necessary result, Navas "failed to satisfy the higher standard of proof for eligibility for withholding of exclusion and deportation." More specifically, the BIA concluded that Navas had failed to demonstrate that he was the victim of acts that constituted persecution, and that no evidence in the record suggested that the reason behind the soldiers' actions with respect to Navas was that they imputed a political opinion to

him. Rather, the BIA agreed with the IJ's conclusion that the murder of Navas's aunt by three military personnel was not politically motivated, and that the murderers' interest in finding Navas "relate[d] to his ability to identify them, not to a desire to harm him on account of one of the enumerated grounds of persecution."

██ Navas then petitioned this court for review on March 30, 1998, pursuant to 8 U.S.C. § 1105(a). In this case, we review the BIA opinion, rather than the Immigration Judge's, because the BIA conducted an independent review of the record and provided its own grounds for affirming the IJ's decision. *Ghaly v. INS,* 58 F.3d 1425, 1430 (9th Cir.1995).

## LEGAL BACKGROUND

### A. *General Framework*

██ The Attorney General may, in her discretion, grant asylum to an applicant determined to be a refugee, within the meaning of section 101(a)(42)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(42)(A). Refugee status is established by evidence that an applicant is unable or unwilling to return to his home country because of a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. *See INS v. Cardoza–Fonseca,* 480 U.S. 421, 428, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987); *Singh v. Ilchert,* 63 F.3d 1501, 1505 (9th Cir.1995). A well-founded fear of future persecution may be established by proving either past persecution or "good reason" to fear "future persecution."[8] *Vilorio–Lopez*

---

7. In reaching his decision, the IJ incorrectly stated that no death certificate or other evidence was admitted to support Navas's testimony. In fact, Navas submitted a death certificate for his aunt, as well as a series of human rights reports from reputable human rights organizations.

In addition, the IJ rejected Navas's claim of possible membership in a political group or participation in political activities, and held that the fact that his uncle had been a member of the FMLN was irrelevant, since the FMLN was now part of the Salvadoran government. He reached this conclusion despite the fact that the uncontested human rights reports in the administrative record documented continuing attacks on FMLN members after the peace accords.

8. Ordinarily, a showing of past persecution simply establishes a presumption of a well-founded fear of future persecution, which may be rebutted by a showing that country

*v. INS*, 852 F.2d 1137, 1140 (9th Cir.1988). If the applicant establishes statutory eligibility for asylum, the Attorney General must, by a proper exercise of her discretion, determine whether to grant that relief.

 To be eligible for a grant of asylum, the applicant must simply demonstrate a well-founded fear of persecution. He need not prove, however, that it is more likely than not that his fear will be realized. As the Supreme Court put it, "[o]ne can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place. As one leading authority has pointed out: 'Let us ... presume that it is known that in the applicant's country of origin every tenth adult male person is either put to death or sent to some remote labor camp.... In such a case it would be only too apparent that anyone who has managed to escape from the country in question will have 'well-founded fear of being persecuted' upon his eventual return.'" *INS v. Cardoza–Fonseca*, 480 U.S. 421, 431, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (quoting 1 A. Grahl–Madsen, The Status of Refugees in International Law 180 (1966)). In contrast, a more stringent standard applies to requests for withholding of deportation, in part because an applicant who meets that standard is not only eligible for, but entitled to, such relief. The Attorney General is required to withhold deportation of an applicant

who can establish a "clear probability" that he would be persecuted were he to be deported to his home country. *See Korablina v. INS*, 158 F.3d 1038, 1045–46 (9th Cir.1998). In order to demonstrate a clear probability of persecution, a petitioner must prove that "it is 'more likely than not'" that he will be persecuted on account of a statutorily-protected ground. *Id.* at 1046.

 The applicant bears the burden of proof with respect to eligibility for asylum and withholding of deportation. 8 C.F.R. §§ 208.13(8), 208.16(b). Specific corroborating documentation is not required, however, for an applicant to meet his burden. *See Sangha v. INS*, 103 F.3d 1482, 1487 (9th Cir.1997). Rather, because refugee status is inherently difficult to prove and documentation hard to obtain, an applicant may establish his case through testimony alone. *See Sangha*, 103 F.3d at 1487; *Garrovillas v. INS*, 156 F.3d 1010, 1016 (9th Cir.1998).

B. *The Requirements for Asylum Eligibility*

 In order to establish eligibility for asylum on the basis of past persecution, an applicant must show: (1) an incident, or incidents, that rise to the level of persecution;[9] (2) that is "on account of" one of the statutorily-protected grounds; and (3) is committed by the government or forces the government is either "unable or

conditions have so changed as to render the applicant's fear no longer reasonable. *See* text accompanying notes 23–24. In certain circumstances, however, eligibility for asylum may be based on past persecution alone, even if there is little or no likelihood of future persecution, "where an applicant or his family has suffered under atrocious forms of persecution...." *Acewicz v. INS*, 984 F.2d 1056, 1062 (9th Cir.1993).

9. Persecution is "the infliction of suffering or harm upon those who differ (in race, religion, or political opinion) in a way regarded as offensive." *Kovac v. INS*, 407 F.2d 102, 107 (9th Cir.1969); *Sangha*, 103 F.3d at 1487. While we have not attempted to furnish a list of all actions that constitute persecution, we

have held that actions such as mob stonings, *Lopez–Galarza v. INS*, 99 F.3d at 957, repeated vandalism, *Surita*, 95 F.3d 814, 817, threatening notes and calls, *Korablina*, 158 F.3d 1038, 1042, and harm arising out of employment and education, *id.* at 1045, may constitute persecution, as defined by the statute. Physical harm has been consistently treated as persecution. *See Duarte de Guinac v. INS*, 179 F.3d 1156, 1161 (9th Cir.1999). Moreover, an applicant may suffer persecution because of the cumulative effect of several incidents, which considered individually would not rise to the level of persecution. *See Shirazi–Parsa v. INS*, 14 F.3d 1424, 1428 (9th Cir.1994).

unwilling" to control.[10] Only the first and second factors—namely, whether the incidents that occurred constitute persecution and whether the persecution was "on account of" a protected ground—are at issue in this petition for review. In other words, to be eligible for relief, Navas must show not only that he was persecuted, but also that the persecution he suffered was on account of a protected category—namely, race, religion, nationality, membership in a social group, or political opinion.[11]

The Supreme Court held in *Elias–Zacarias* that an asylum applicant must satisfy two requirements in order to show that he was persecuted "on account of" a political opinion. First, the applicant must show that he held (or that his persecutors believed that he held) a political opinion. *See Elias–Zacarias*, 502 U.S. at 482–83, 112 S.Ct. 812.[12] Second, the applicant must show that his persecutors persecuted him (or that he faces the prospect of such persecution) *because of* his political opinion. *See id.* at 483–84, 112 S.Ct. 812. As this court has made clear, the statute covers persecution on account of political opinion even where the persecutor acts out of mixed motives. Put another way, the protected ground need only constitute *a* motive for the persecution in question; it need not be the *sole* motive. *Borja v. INS*, 175 F.3d 732, 735 (9th Cir.1999) (en banc); *Singh*, 63 F.3d at 1509.

A finding that persecution was on account of a protected category must be based on facts in evidence. *See Elias–Zacarias*, 502 U.S. at 483, 112 S.Ct. 812; *Sangha*, 103 F.3d at 1486. The applicant need not provide direct evidence that his

---

**10.** The statute defines a refugee as any person outside of their country of nationality who is "unable or unwilling to avail himself or herself of the protection [their country]." 8 U.S.C. § 1101(a)(42)(A). As such, our cases have held that the statute protects people from persecution by nongovernmental groups in cases in which the government is unable or unwilling to control the persecuting agent. *Sangha*, 103 F.3d at 1487; *Arteaga v. INS*, 836 F.2d 1227 (9th Cir.1988); *McMullen v. INS*, 658 F.2d 1312, 1315 (9th Cir.1981) *superseded on other grounds by* 8 U.S.C. § 1253(h). Government action is not necessarily required; instead, police inaction in the face of such persecution can suffice to make out a claim. *R.J. Singh*, 94 F.3d at 1357; *Surita v. INS*, 95 F.3d 814, 817; *Andriasian v. INS*, 180 F.3d 1033, 1042–43 (9th Cir.1999). In particular, arrests by police, without more, may not be sufficient to rebut claims that the government is unable or unwilling to stop persecutors, *Chitay–Pirir v. INS*, 169 F.3d 1079, 1081 (7th Cir.1999), especially where the punishment may amount to no more than a "slap on the wrist." *R.J. Singh*, 94 F.3d at 1357.

**11.** In order to succeed in proving eligibility for asylum, an applicant's well-founded fear of persecution must be both subjectively genuine and objectively reasonable. *See Korablina*, 158 F.3d at 1044. An applicant satisfies the subjective component by credibly testifying that he genuinely fears persecution. *Id.* He satisfies the objective component in one of two ways: by establishing either past persecu-

tion or good reason to fear future persecution. In this case, the BIA's decision was predicated on what it perceived as a failure to meet the objective component of that test by establishing past persecution.

**12.** The Court in *Elias–Zacarias* and this court have elaborated on this requirement in two ways. First, the Supreme Court left open the possibility that it would suffice for an applicant to show that his persecutors imputed a political opinion to him, even if he did not in fact hold any political opinion. *See Elias–Zacarias*, 502 U.S. at 482, 112 S.Ct. 812. Since *Elias–Zacarias* was decided, this court has held on several occasions that imputed political opinion is a basis for asylum. *See, e.g., Vera–Valera v. INS*, 147 F.3d 1036, 1038 (9th Cir.1998); *Sangha v. INS*, 103 F.3d 1482, 1489 (9th Cir.1997). Second, the Court did not preclude the possibility that political neutrality might constitute a political opinion. *See Elias–Zacarias*, 502 U.S. at 483, 112 S.Ct. 812. Since then, this court has stated unequivocally that its pre-*Elias-Zacarias* decisions holding that persecution on account of political neutrality in an environment in which political neutrality "is fraught with hazard," is a basis for asylum. *See Sangha*, 103 F.3d at 1488–89. That *is* the law of this circuit. *Cf. Rivera Moreno v. INS*, 213 F.3d 481 (9th Cir.2000) (acknowledging and applying the doctrine of "hazardous neutrality" as the law of this circuit although questioning in dictum its validity) (per Aldisert, J., sitting by designation).

or her persecutors were motivated by political opinion, *Elias–Zacarias*, 502 U.S. at 483, 112 S.Ct. 812, but need only introduce "*some* evidence of [the persecutors' motive], direct or circumstantial." *Id.* (Emphasis added). In some cases, the factual circumstances alone may provide sufficient reason to conclude that acts of persecution were committed on account of political opinion, or one of the other protected grounds. *See Sangha*, 103 F.3d at 1490. Indeed, this court has held persecution to be on account of political opinion where there appears to be no other logical reason for the persecution at issue. *See Sangha*, 103 F.3d at 1490; *Nasseri v. Moschorak*, 34 F.3d 723, 730 (9th Cir.1994), *overruled on other grounds by Fisher v. INS*, 79 F.3d 955 (9th Cir.1996) (en banc).

▮ If an asylum applicant establishes that he has been subjected to persecution in the past, a presumption arises that a well-founded fear of future persecution exists. 8 C.F.R. § 208.13(b)(1)(i). The burden then shifts to the INS to show by a preponderance of the evidence that country conditions have changed to such an extent (as applied to the individual's case) that the applicant no longer has a well-founded fear that he would be persecuted if he were to return.[13] *Id.* If the INS fails to make this showing, the applicant is statutorily eligible for asylum. *Maini v. INS*, 212 F.3d 1167 (9th Cir. 2000).

▮ A similar approach applies with respect to withholding of deportation. A showing of past persecution gives rise to a presumption that the applicant has shown a clear probability of future persecution so as to entitle him to withholding of deportation. *See* 8 C.F.R. § 208.16(b)(2); *Valle-*

*cillo–Castillo v. INS*, 121 F.3d 1237, 1240 (9th Cir.1996). In order to rebut the presumption, the INS must show that country conditions have so changed that it is no longer more likely than not that the applicant would be persecuted should he be forced to return.

## C. Standard of Review

▮ The BIA's factual determinations are reviewed for substantial evidence, *INS v. Elias–Zacarias*, 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992), while its legal determinations are reviewed in accordance with the principles of deference outlined in *Chevron v. N.R.D.C.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See INS v. Aguirre–Aguirre*, 526 U.S. 415, 119 S.Ct. 1439, 1445, 143 L.Ed.2d 590 (1999). Reversal is warranted if the evidence would compel any reasonable factfinder to conclude that the requisite fear of persecution has been shown. *See Elias–Zacarias*, 502 U.S. at 481, 484, 112 S.Ct. 812; *Singh v. INS*, 134 F.3d 962, 966 (9th Cir.1998); *Sangha*, 103 F.3d 1482, 1487 (9th Cir.1997).

## ANALYSIS

### 1. Persecution

▮ There are two issues in this case: first, whether the incidents in question constitute persecution; and second, if so, whether that persecution was on account of (imputed) political opinion. In resolving these questions, given the absence of an adverse credibility finding by the BIA we must assume that Navas's factual contentions are true. *See Gaya Prasad v. INS*, 101 F.3d 614, 616 (9th Cir.1996). As a result, the issue is not whether the events

---

**13.** In order to conclude, on the basis of changed country conditions, that an applicant's fear of persecution is no longer reasonable, the BIA must engage in an "individualized analysis" that demonstrates that "changed conditions ... have eliminated the basis for [the applicant's] individual fear of future persecution." *Osorio v. INS*, 99 F.3d 928, 932–33 (9th Cir.1996); *see also Berroter-*

*an–Melendez v. INS*, 955 F.2d 1251, 1257 (9th Cir.1992) (cautioning against "blind" application of country conditions information to individual cases). General information about improving conditions may not be enough to rebut an applicant's specific basis for a well founded fear of persecution. *Duarte de Guinac*, 179 F.3d at 1163.

in question took place, but rather whether they establish persecution on account of political opinion. We hold that the evidence would compel any reasonable fact-finder to conclude that they do.

With respect to the first issue, the conclusion that Navas has demonstrated persecution is dictated by this court's earlier cases. In asylum and withholding of deportation cases, we have consistently held that death threats alone can constitute persecution. *See Del Carmen Molina v. INS*, 170 F.3d 1247 (9th Cir.1999);[14] *Garrovillas v. INS*, 156 F.3d 1010, 1016 (9th Cir.1998); *Gonzales–Neyra v. INS*, 122 F.3d 1293, 1296 (9th Cir.1997); *Gonzalez v. INS*, 82 F.3d 903 (9th Cir.1996); *Gomez–Saballos v. INS*, 79 F.3d 912 (9th Cir.1996); *Aguilera–Cota v. INS*, 914 F.2d 1375 (9th Cir.1990). This case involves considerably more; here, Navas was not only threatened with death, but two members of his family were murdered, he was shot at, and his mother beaten.[15] Under our precedent, Navas has unquestionably demonstrated persecution.

### 2. "On Account of" Imputed Political Opinion

Therefore, as both sides acknowledge, the second issue—whether the persecution was on account of Navas's (im-puted) political opinion, is the key to this proceeding.[16] The government argues that the threats to Navas occurred because he witnessed a criminal act, not because of his—or any other family member's—political opinion. The government further contends that, in the absence of evidence connecting the 1992 murder of Navas's aunt to the 1988 murder of her husband, or of additional incidents occurring before the murder, Navas cannot be said to have sustained the burden of demonstrating a causal connection between the harm suffered and a political opinion on his part. We reject these arguments.

While we have held that an applicant proves persecution on account of political opinion where he demonstrates that he had such an opinion and that his persecutors threatened him because of it, *see Gonzales–Neyra*, 122 F.3d at 1296; *see also Borja*, 175 F.3d at 736, we have also held that this is not the only way to establish the requisite link between persecution and political opinion. An applicant can also establish persecution on account of *imputed* political opinion—that is, on account of a political opinion attributed to him by his persecutors. *See Cordon–Garcia v. INS*, 204 F.3d 985, 991 (9th Cir. 2000); *Sangha v. INS*, 103 F.3d 1482, 1489

---

14. In *Del Carmen Molina*, we held that where the petitioner's uncontradicted testimony stated that some of her cousins had been killed because they served in the military and that she had received two threatening notes, she had proved past persecution.

15. In addition, the record includes reports that describe a widespread pattern of killings, assaults and threats by government forces directed against those who either do or are presumed to oppose it.

16. The government also asserts that the evidence in the record does not suffice to show an objective basis for Navas's fear of persecution because his testimony was brief and lacking in detail. However, this court cannot affirm the BIA on a ground upon which it did not rely. *See, e.g., Securities and Exchange Commission v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947) ("[A]

reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative decision by substituting what it considers to be a more adequate or proper basis."). Because "[this court's] review is confined to the BIA's decision and the bases upon which the BIA relied," *Martinez–Zelaya v. INS*, 841 F.2d 294, 296 (9th Cir.1988), we cannot affirm the BIA's decision by concluding that Navas's testimony is too sparse when there is no suggestion of any such finding in the agency's decision. Moreover, the government's new and belated argument appears to be makeweight at best. The evidence is more than sufficient to carry Navas's burden.

(9th Cir.1997).[17] To establish imputed political opinion, "an applicant must show that his persecutors actually imputed a political opinion to him." *Sangha*, 103 F.3d at 1489. This can be done, as we noted earlier, by a showing of the relevant circumstances; accordingly, we have found persecution to be on account of imputed political opinion where the applicant is a member of a politically active family, other members of which have been persecuted in the past for their political beliefs,[18] or where the persecutors' conduct or statements show that they are imputing a particular opinion to their victim. *Id.* at 1489.

 In determining whether or not an applicant has established persecution on account of imputed political opinion, this court has considered the applicant's association with, or relationship to, people who are known to hold a particular political opinion.[19] For example, in *Ramirez Rivas*

17. In *Sangha*, we held that where members of the Bhindrawala Tiger Force, a terrorist group, came to the petitioner's house, but sought (and assaulted) only the petitioner's father, the fact that they ignored Sangha "suggests that [they] did not believe that Sangha held his father's views." *Sangha*, 103 F.3d. at 1490.

18. Although the persecution of family members is highly probative, " 'the death of one family member does not [automatically] trigger a sweeping entitlement to asylum eligibility for all members of her extended family.' " *Mgoian v. INS*, 184 F.3d 1029, 1036 (9th Cir.1999) (quoting *Echeverria–Hernandez v. INS*, 923 F.2d 688, 691 (9th Cir.1991), vacated on other grounds by *Echeverria–Hernandez v. INS*, 946 F.2d 1481 (9th Cir.1991)). Rather, when evidence regarding a family history of persecution is considered, the relationship that exists between the persecution of family members and the circumstances of the applicant must be examined. *Id.; see also Rodriguez v. INS*, 841 F.2d 865, 871 (9th Cir.1987) (a number of threats or acts of violence against members of an alien's family may be enough to support the conclusion that the alien's life or freedom is also endangered).

Where police beat and threaten the spouse of a known dissident, it is logical, in the absence of evidence pointing to another motive, to conclude that they did so because of the spouse's presumed guilt by association. *See, e.g., Sangha*, 103 F.3d at 1490–91; *Nasseri*, 34 F.3d at 729; *Rodriguez–Roman*, 98 F.3d at 429–30; *see also Ramirez Rivas*, 899 F.2d at 865–66 (rejecting the INS's argument that a petitioner must be "similarly situated" in terms of political activity in order to show that her family's beliefs will be imputed to her.) In the eyes of those who persecute the spouse of a political activist, the activist's political sins are, by derivation, the spouse's. *See Meza–Manay v. INS*, 139 F.3d 759, 764–65 (9th Cir.1998); *Lazo–Majano*, 813 F.2d at 1435. *Cf. Belayneh v. INS*, 213 F.3d 488 (9th Cir.2000) (rejecting claim of persecution on account of imputed political opinion where the couple had been divorced for over fifteen years, the record was "devoid of any suggestion" that her former husband's views had been imputed to her, the government had changed twice in the interim, and the only direct persecution suffered by the petitioner herself occurred over a quarter-century earlier).

19. Alternatively, imputed political opinion may also be established where, as a result of an individual's non-political actions, the persecutor attributes certain political beliefs or opinions to him. For example, we have found persecution to be on account of imputed political opinion where, regardless of the petitioner's motives, he expressly refused to affiliate himself with a particular political faction or to accede to its extortionate demands, and was then perceived by the group as opposing it because of that refusal. *Desir v. Ilchert*, 840 F.2d 723, 728 (9th Cir.1988); *Alonzo v. INS*, 915 F.2d 546, 549 (9th Cir.1990). Similarly, we have found persecution of those who work for or with political figures to be on account of the political opinion of their employer even if the nature of their work for or with that person is not in itself political. *See Cordon–Garcia*, 204 F.3d at 991–992 (holding that, where Cordon–Garcia taught literacy classes for the government, her " 'presumed affiliation' with the Guatemalan government—an entity the guerillas oppose—is the functional equivalent of a conclusion that she holds a political opinion opposite to that of the guerillas, whether or not she actually holds such an opinion"); *Velarde v. INS*, 140 F.3d 1305, 1312 (9th Cir.1998) (petitioner's position as bodyguard to President's family meant that guerillas were "likely to consider [her] a political opponent"); *Vera–Valera*, 147 F.3d at 1039 (petitioner's position as president of street vendor's cooperative, although not political in nature, gave rise to perception on the part of his persecutors that his work represented political advocacy, and thus es-

*v. INS,* 899 F.2d 864 (9th Cir.1990), we concluded that where the petitioner in question and her parents were politically neutral, but other members of the family participated in anti-government activities, Ramirez had proven her entitlement to withholding of deportation, as well as statutory eligibility for asylum, by presenting three kinds of evidence: her own testimony regarding the persecution of politically active members of her family; her testimony regarding the mistreatment of even politically neutral members of her family; and information regarding the Salvadoran government's treatment of persons associated with guerillas—in particular, the targeting of relatives and close associates of members of guerila associations by death squads.[20] *See Ramirez Rivas,* 899 F.2d at 867–869.

Similarly, in *Gomez–Saballos v. INS,* 79 F.3d 912, 917 (9th Cir.1996), we held that the fact that the petitioner and the person who threatened to kill him were on opposite sides of a civil war, and that the person who threatened to kill him was responsible for the execution of his brother as a revolutionary, was sufficient to demonstrate persecution on account of political opinion. In that case also, we found that the petitioner had not just shown statutory eligibility for asylum, but in fact had established a clear probability of persecution on account of his political opinion, and there-fore reversed the BIA's decision with respect to both forms of relief.[21] *Id.* at 918.

In this case, the question whether Navas's persecution was on account of imputed political opinion turns in part on whether the persecution of other family members was politically motivated. The government concedes that the murder of Navas's uncle was political, but disputes the fact that his aunt's murder was. The circumstances of the latter murder make it clear, however, that the killing of Navas's aunt, like the killing of her husband, must be deemed political. Navas's aunt had been married to a member of the FMLN who had been murdered because of his opposition to the government. She in turn was murdered by members of the government's military forces—an action consistent with the country-wide pattern of the Salvadoran military acting to punish civilians for presumed guerila sympathies. We have held that "[i]f 'there is no evidence of a legitimate prosecutorial purpose for a government's harassment of a person ... there arises a presumption that the motive for harassment is political.'" *Singh v. Ilchert,* 63 F.3d 1501, 1509 (9th Cir.1995). Here, there is no suggestion in the record that there was any cause for the murder of Navas's aunt by members of the military other than her murdered husband's political activities and her relation-

---

tablished eligibility based upon imputed political opinion); *Aguilera–Cota v. INS,* 914 F.2d 1375, 1379 (9th Cir.1990) (finding imputed political opinion based upon government employment). *Cf. Arriaga–Barrientos v. INS,* 937 F.2d 411, 414 (9th Cir.1991) (as amended on denial of rehearing) (holding that in a country with mandatory conscription, "mere accedance to military service is not a political statement").

**20.** In that case, we also rejected the BIA's argument that Ramirez could not reasonably fear persecution because the authorities had an opportunity to persecute her from the time of the death of her cousin in 1980 until her departure in 1983, but did not. *Id.* at 970. We held that with the occurrence of each additional incident of persecution, the proba-

bility that Ramirez herself would be assumed to be a sympathizer rose. *Id.*

**21.** We have also found persecution to be on account of imputed political opinion in three recent cases. *See Yazitchian v. INS,* 207 F.3d 1164 (9th Cir.2000) (finding persecution on account of imputed political opinion where the Yazitchians' persecutors accused them of being Dashnak supporters and Yazitchian's father and father-in-law had fought for the Dashnak party); *Chanchavac v. INS,* 207 F.3d 584 (9th Cir.2000) (finding persecution on account of imputed political opinion where the Guatemalan military accused Chanchavac of being a guerila when beating him); *Cordon–Garcia v. INS,* 204 F.3d 985, 991 (9th Cir.2000) (finding persecution on account of imputed political opinion where exclusive reason why guerillas pursued Cordon–Garcia

ship to him. As a result, the logical inference to be drawn from the circumstances is that the murder of Navas's aunt was also politically motivated—that the soldiers presumed sympathy for the FMLN's position on her part and that they killed her for that reason. *See Sangha,* 103 F.3d at 1487.

■ Navas himself had distributed political materials, and the soldiers who murdered his aunt knew of his political activity. Those soldiers went to his house on the day after the murder and when he could not be found, they attacked his mother. Typically, where killings and other acts of violence are inflicted on members of the same family by government forces, "the inference that they are connected and politically motivated is an appropriate one." *Hernandez–Ortiz v. INS,* 777 F.2d 509, 517 (9th Cir.1985). Thus, where two members of Navas's family were the victims of politically-motivated murders, and where Navas's political activities were known to his persecutors, the inference *must* be that Navas's persecution was, *at least in part,* on account of political opinion.

■ We have held that "'[t]he plain meaning of the phrase "persecution on account of the victim's political opinion," does not mean persecution *solely* on account of the victim's political opinion.'" *Borja,* 175 F.3d at 734 (quoting *Osorio v. INS,* 18 F.3d 1017, 1028 (2d Cir.1994)) (emphasis added). Rather, "[p]ersecutory conduct may have more than one motive, and so long as one motive is one of the statutorily enumerated grounds, the requirements have been satisfied." *Singh v. Ilchert,* 63 F.3d 1501, 1509–10 (9th Cir.1995). Accordingly, because the persecution of Navas was motivated at least in part by his

(imputed) political opinions, he has established persecution on account of those opinions.

In its decision, however, the BIA found that the soldiers' actions were motivated solely by the desire to avoid prosecution. That conclusion is patently erroneous, as any reasonable factfinder would be compelled to conclude. The BIA portrayed the soldiers' actions in attacking Navas's mother and threatening Navas with death as simply attempts to eliminate a witness to the murder.[22] The BIA erred in four respects in reaching this conclusion: first, by attacking the mother and threatening the son, the murderers did not eliminate a witness to their earlier crime. Instead, they committed another crime *and* created another witness in the process. Second, the murderers did not threaten retaliation if Navas went to the police, nor did they demonstrate any concern that he might do so. Rather, they made their ultimatum quite clear—leave the country or die. Third, Navas introduced substantial evidence into the administrative record that showed that well after the peace accord was reached in 1992 (the same year as his departure from El Salvador), the police and soldiers continued to violate human rights with impunity. Prosecution of the soldiers for their actions was, therefore, highly unlikely in any event. Finally, as we have stated earlier, Navas's evidence regarding the historical background to the threats against his life establishes that at least one of the reasons for the soldiers' actions was his family's political associations, as well as his own, and the soldiers' imputation of a political opinion to him. Accordingly, any reasonable factfinder would be compelled to conclude that Navas's persecution was, at least in part, on account of imputed political opinion. *See,*

was that she taught literacy for the government).

**22.** Similarly, in *Chanchavac,* the INS argued that the military's motive for persecuting Chanchavac was to punish his failure to join the military's ranks, not to punish him for an imputed political opinion, even though the Guatemalan military accused Chanchavac of

being a guerilla when beating him. 207 F.3d at 592. However, as the majority put it, "[t]here [was] absolutely no evidence that the military's motive for beating him was to punish him for not joining their ranks and it would be improper for us to speculate about this possibility. Even if this theory had support in the evidence, it would only prove that the Guatemalan military had two motives

e.g., *Ratnam v. INS*, 154 F.3d 990, 995–96 (9th Cir.1998) (finding that torture was conducted at least in part on account of imputed political opinion, even though it also served intelligence gathering purposes).

### 3. Country Conditions

■■■■ Because Navas has established past persecution on account of political opinion, the INS bears the burden of demonstrating by a preponderance of the evidence that changed country conditions rebut the presumption of a well-founded fear of future persecution. 8 C.F.R. § 208.13(b)(1)(i). In order to rebut that fear, the INS must introduce evidence that, on an individualized basis, rebuts a particular applicant's specific grounds for his well-founded fear of future persecution. *Osorio*, 99 F.3d at 932–33. Here, however, the BIA did not consider the country conditions issue. Accordingly, the question with respect to the asylum claim is whether to remand to allow the BIA to consider country conditions or simply to reverse on the question of eligibility and remand so that the Attorney General may exercise her discretion.[23]

■■■■ In general, we do not remand a matter to the BIA if, on the record before us, it is clear that we would be compelled to reverse its decision if it had decided the matter against the applicant. *See Aguilera–Cota v. INS*, 914 F.2d 1375, 1384 (9th Cir.1990) (citing *Blanco–Comarribas v. INS*, 830 F.2d 1039, 1043 (9th Cir.1987)); *Kotasz v. INS*, 31 F.3d 847, 851 (9th Cir.1994); *Fergiste v. INS*, 138 F.3d 14 (1st Cir.1998); *see also Akinmade v. INS*, 196 F.3d 951, 958 (9th Cir.1999); *Chanchavac*, 207 F.3d at 591.[24] Nor is it consistent with sound principles of administrative law for an agency to resolve a case on one ground and subsequently, if that ground is held erroneous, assert that it could have reached the same result on the basis of one or more alternative grounds. Such a practice would lead to incremental decision-making and result, in some cases, in a series of unnecessary and inefficient remands, to the detriment of the party seeking relief.

With respect to country conditions, however, it is reasonable for the IJ and the BIA not to reach that issue, if they conclude that the applicant has not shown past persecution. In such case, no presumption of a well-founded fear arises and there is thus no reason for the IJ or BIA to consider whether the presumption has been rebutted. Nevertheless, because the INS is required to make a complete record during the administrative proceedings, we review that record to determine whether there is room for doubt as to the proper result with respect to the country conditions issue.

■■■■ Where, as here, we conclude that past persecution has been established, but the INS has failed to introduce the requisite country conditions information and thus has failed to meet its evidentiary burden on that issue, we do not remand, because the ultimate outcome is clear. *See Aguilera–Cota*, 914 F.2d at 1384. In this case, the reports in the record all note the continuing immunity enjoyed by the police and military, as well as the persistence of politically-motivated violence, notwithstanding the peace accords. We emphasize, however, that the presence of evidence *favorable* to the petitioner is not what is determinative here; rather, the basis for our decision is the absence of evidence refuting the regulatory presump-

---

when it persecuted Chanchavac." *Chanchavac*, 207 F.3d at 592.

**23.** In three recent cases, we have determined the issue of eligibility and remanded solely for the Attorney General's exercise of her discretionary authority, even though the BIA had not considered the question of changed country conditions. *Maini v. INS*, 212 F.3d 1167 (9th Cir.2000); *Prasad v. INS*, 101 F.3d 614, 617 (9th Cir.1996); *Vallecillo–Castillo v. INS*, 121 F.3d 1237, 1240 (9th Cir.1996).

**24.** As we noted above, we cannot affirm the BIA's decision on a basis on which it did not rely. *Martinez–Zelaya*, 841 F.2d at 296; *Menezes v. INS*, 601 F.2d 1028, 1033 n.7 (9th Cir.1979).

tion. In view of the above, we hold that Navas is statutorily eligible for asylum. *Maini*, 212 F.3d at 1177; *Vallecillo–Castillo v. INS*, 121 F.3d 1237, 1240 (9th Cir. 1996).

4. *Withholding of Deportation*

While the standard for withholding of deportation is more stringent than for eligibility for asylum, the finding of past persecution in this case also triggers a presumption that Navas has shown a clear probability of future persecution with respect to his withholding claim-a presumption that the INS may also rebut by an individualized showing of changed country conditions. *See* 8 C.F.R. § 208.16(b)(2); *Vallecillo–Castillo v. INS*, 121 F.3d 1237, 1240 (9th Cir.1996). Again, there is nothing in the record that would serve to rebut that presumption. Accordingly, we find that Navas is entitled to withholding of deportation.

Petition for review GRANTED; REMANDED for the exercise of the Attorney General's discretion with respect to the asylum claim, and for the grant of withholding of deportation.