**Edward Byabashija KABATERAINE, Petitioner,**

v.

**Alberto R. GONZALES, Attorney General, Respondent.**

**No. 04–70168.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 16, 2006.

Filed Nov. 30, 2006.

Judith L. Wood, Esq., Law Offices of Judith L. Wood, Human Rights Project, Los Angeles, CA, for Petitioner.

CAC–District Counsel, Esq., Office of the District Counsel Department of Homeland Security, Los Angeles, CA, Ronald E. LeFevre, Chief Counsel, Office of the District Counsel, Department of Homeland Security, San Francisco, CA, Joan E. Smiley, Esq., Cindy S. Ferrier, Esq., Stacy S. Paddack, DOJ–U.S. Department of Justice Civil Div./Office of Immigration Lit., Washington, DC, for Respondent.

Before: B. FLETCHER, CUDAHY,* and GRABER, Circuit Judges.

* The Honorable Richard D. Cudahy, Senior United States Circuit Judge for the Seventh

## ORDER[**]

Respondent has moved for a remand of this case to the Board of Immigration Appeals so that it may reconsider the entire decision. We understand the motion to cover both repapering and the claims for asylum, withholding of removal, and relief under the Convention Against Torture. Petitioner does not object to the motion. Accordingly, we grant the motion.

Motion GRANTED; REMANDED.

## B. FLETCHER, Circuit Judge, concurring.

I write separately to note that the record we reviewed supports a finding that there is substantial evidence of past persecution and of a well-founded fear of future persecution on account of imputed political opinion.

First, Kabateraine presented unrebutted evidence of past persecution. "Physical harm has consistently been treated as persecution." *Chand v. INS,* 222 F.3d 1066, 1073 (9th Cir.2000). The IJ acknowledged that Kabateraine's testimony was credible. Kabateraine testified that the first time he was arrested, he was detained for four days and beaten with a belt and stick by secret service agents who were part of the governing National Resistance Movement ("NRM"). He testified that during his second arrest, the secret service "tortured ... and ... beat me seriously." The secret service agents burned Kabateraine's stomach and left rib cage with a sharp instrument "to get me to talk" and "slammed on my legs so hard" that they broke his kneecap. They continued to beat him with a boot and a stick. As a result, Kabateraine had to use a cane for about three months and has permanent scars. The harm Kabateraine suffered clearly rises to the level of persecution.

Second, Kabateraine demonstrated that "his persecutors actually imputed a political opinion to him," *Sangha v. INS,* 103 F.3d 1482, 1489 (9th Cir.1997), because the secret service agents thought the Well-wishers charity organization he created and headed "w[as] political in nature." It is well-established that persecution due to imputed political opinion is a valid basis for asylum. *See, e.g., Sangha,* 103 F.3d at 1489 ("If the persecutor attributed a political opinion to the victim, and acted upon the attribution, this imputed view becomes the applicant's political opinion as required under the Act."); *Canas–Segovia v. INS,* 970 F.2d 599, 601–02 (9th Cir.1992); *Navas v. INS,* 217 F.3d 646, 658 (9th Cir. 2000) (imputed political opinion can be established where "political opinion [is] attributed to him by his persecutors.").

Kabateraine testified that the secret service agents who detained and beat him "thought ... [the Well-wishers] were not agreeing with the government and ... what the government was doing at the time." Kabateraine held Well-wishers meetings in his restaurant. He testified that during his first detention, the secret service agents "mainly ... were interrogating ... to get me [to] say something about the meetings, and I would tell them that mainly they were just ... charity meetings." The agents asked, "are your meetings ... political in nature," "[a]re your meetings discussing anything about the government," and "[a]re your meetings contributing money for other causes other than, ... the cause you're telling us?" During his second detention, the agents

---

Circuit, sitting by designation.

[**] This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir. R. 36–3.

again demanded to know whether the Well-wishers meetings were "political in nature." Kabateraine testified, "I wasn't saying anything that they wanted to hear as far as the ... meetings were concerned," so they tortured him.

Kabateraine's uncontradicted testimony demonstrated that NRM secret service agents tortured him because they thought that he was engaged in anti-government political activity through the Well-wishers. *See Navas*, 217 F.3d at 657 (only *"some* evidence of [the persecutors' motive], direct or circumstantial" is required) (quoting *INS v. Elias–Zacarias*, 502 U.S. 478, 483, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992)). That Kabateraine's father was a member of the former regime and Kabateraine was related through his first wife to Paul Muwanga, the former Vice President, provided additional evidence that the NRM believed Kabateraine to be politically active. Whether or not Kabateraine was *in fact* politically active is irrelevant. The record evidence would seem to compel a reasonable factfinder to conclude that the NRM persecuted him on account of imputed political opinion.[1]

Having presented substantial evidence of past persecution, Kabateraine is presumed to have a well-founded fear of future persecution. *Navas*, 217 F.3d at 657; *Guo v. Ashcroft*, 361 F.3d 1194, 1204 (9th Cir.2004). The burden shifts to the government "to show by a preponderance of the evidence that country conditions have changed to such an extent (as applied to the individual's case) that the applicant no longer has a well-founded fear that he would be persecuted if he were to return." *Navas*, 217 F.3d at 657. The evidence shows that the NRM government headed by Museveni is still in power, "[t]he local police chief has never changed," Kabateraine could not move elsewhere in Uganda because "the government ... would find [him]," and, most importantly, the government still arrests, beats, and kills their perceived and actual political opponents. There is no evidence in the record of relevant changes in the Ugandan government that would undermine Kabateraine's well-founded fear of persecution should he return.

The issue of whether Kabateraine has established entitlement to withholding of

---

1. Even though Kabateraine acknowledged that the Ugandan government did not permit public meetings, there is "no evidence in the record ... that an actual, legitimate, criminal prosecution was initiated against" him. *Singh v. Ilchert*, 63 F.3d 1501, 1509 (9th Cir. 1995) (quoting *Blanco–Lopez v. INS*, 858 F.2d 531, 534 (9th Cir.1988)) (quotation marks omitted). First, there is no evidence in the record showing that the kind of meetings Kabateraine held violated Ugandan law. Second, Kabateraine explained that while Well-wishers meetings were open to anyone interested in attending, they were not public meetings in the sense he believed were prohibited by the Ugandan government. He testified, "[t]he meetings that [the government] never allowed was like going in public and calling the people and talking about anything like that was ... contrary ... to the government." The Well-wishers meetings were "not those

particular meetings." Third, Kabateraine's detentions, one of which lasted four days and the other of which involved being burned with a sharp object and having a kneecap broken, "can hardly [be] characterize[d] ... as an example of legitimate criminal prosecution." *Blanco–Lopez*, 858 F.2d at 534. In any case, Kabateraine's country conditions evidence shows that the Ugandan government suppressed public demonstrations *as a means of political repression*. Thus, on remand, the BIA will be compelled to conclude that "the incident[s] described by [Kabateraine] w[ere] not in furtherance of a criminal prosecution, but rather w[ere] one[s] of governmental *persecution* based on [his] perceived political beliefs." *Id.; see also Singh*, 63 F.3d at 1510 ("The task of the alien is simply to demonstrate the reasonableness of a motivation which is related to one of the enumerated grounds.").

removal under the Convention Against Torture turns on whether the persecution he suffered rose to the level of torture. This would seem to be the case. The evidence in the record shows that governmental security forces and local police specifically target, arrest, and torture perceived political opponents such as Kabateraine. Of course, "relief under the Convention does not require that the prospective risk of torture be on account of certain protected grounds," *Kamalthas v. INS*, 251 F.3d 1279, 1280 (9th Cir.2001), but that Kabateraine would more likely than not be tortured if he returned to Uganda. Given his credible testimony about past torture, *see* 8 C.F.R. § 208.16(c)(3)(i), and the evidence showing continued "gross, flagrant or mass violations of human rights" in Uganda, *id.* at § 208.16(c)(3)(iii), it would seem that Kabateraine has established eligibility for relief under the Convention Against Torture.

For these reasons, I believe that on reconsideration, the BIA will be compelled to grant Kabateraine's asylum application, withholding of deportation because of fear of future persecution, and withholding of removal under the Convention Against Torture because of substantial grounds for believing he would be in danger of being subjected to torture in Uganda.